532 A.2d 1089

**Rudolph F. WINTERNITZ**

v.

**SUMMIT HILLS JOINT VENTURE, et al.**

**No. 222, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Nov. 9, 1987.

Certiorari Denied March 28, 1988.

Thomas Patrick Ryan (Paul H. Ethridge, on the brief), Rockville, for appellant.

Brian J. Nash (Donahue, Ehrmantraut & Montedonico, Chartered, on the brief), Rockville, for appellees.

Argued before WILNER, BISHOP and .ROBERT M. BELL, JJ.

WILNER, Judge.

Appellant operated a pharmacy and convenience store in the Summit Hills Shopping Center under a lease that expired on January 31, 1983. In an action filed in the Circuit Court for Montgomery County, he contended that (1) the landlord orally agreed to renew that lease and to permit him to assign it to a purchaser of his business, (2) the landlord and its agents thereafter breached both the renewed lease and the assignment agreement, and (3) as a result of their conduct, he was required to reduce significantly the sale price of his business. A jury apparently credited his story, for it awarded him $45,000 in damages for breach of lease (Count I), breach of an assignment agreement (Count II), and malicious interference with his contract to sell the business (Count III).

The court nullified that award by granting judgment N.O.V., principally on the basis that the Statute of Frauds

(Md.Code Ann. Real Prop. art., § 5–103) made the alleged lease renewal unenforceable, leaving nothing to assign. The correctness of that ruling is the issue in this appeal.

The relevant facts, taken in a light most favorable to appellant, are as follows.

Appellant was operating his pharmacy under a six-year lease that expired January 31, 1983. The rent was $1,658 per month. Paragraph 24 of the lease obliged appellant to deliver possession of the premises at the end of the term, but paragraph 25 provided that, if he continued in possession thereafter, he would become a month-to-month tenant, at a rental of $1,658 per month. That extended month-to-month tenancy was subject to termination by either party upon 30 days written notice.

The landlord, since 1979, was Summit Hills Joint Venture. It employed Southern Management Corporation to manage the shopping center. Ronald Frank, a partner in the Joint Venture, was an officer of Southern Management; Bonita Harris was employed by Southern Management as a property manager.

In October, 1982, appellant met with Mr. Frank to discuss a renewal of the lease. He informed Frank that he might want to sell his pharmacy business and asked if there would be any objection to his transferring the lease. Frank, according to appellant, agreed to renew the lease and indicated that there would be no objection to an assignment if the assignee was financially sound. In mid-January, 1983, Ms. Harris delivered to appellant a proposed two-year lease, with a conditional option to renew for an additional eight years, the condition being that appellant make certain renovations to the premises by October 31, 1984. The rent for the first two years was to be $1,700 per month, subject to escalation during the optional eight-year extension. After some clarification by Ms. Harris with respect to the renovations, appellant said that he accepted the lease and asked when it could be signed.

The signature lines on the proposed new lease showed that appellant would sign as tenant and that Ms. Harris, as property manager, would sign for the landlord. On the front and last pages, however, someone had written the word "SAMPLE." Appellant stated that that marking was on the lease when he received it. Despite the fact that both appellant and Ms. Harris were apparently authorized to sign the lease at that time, it was not in fact signed; indeed, Ms. Harris told appellant that "there was nobody available to sign [the lease] at that time." She instructed appellant to pay the new rent—$1,700—rather than the existing rent —$1,658—for February in the expectation that, at some point, a new lease would be signed. He did so.

In the belief that he had a renewal of the lease and permission to assign it, appellant listed the business for sale in mid-January. His agent quickly found a buyer, and, on February 2, 1983, appellant signed a contract with the Suh family to sell the business for $70,000 plus the "full whole-sale price" of the inventory. The contract made specific mention of the lease. Paragraph 1(c) stated: "Purchaser to assume the following obligations of Seller as part of pur-chase price: Lease on the premises for two years @ $1,700 per month plus an option for 8 yrs at rent plus CPI not to exceed 12% per yr."

A further provision near the bottom of the contract stated: "This contract is contingent on seller procuring lease as stated in 1(c) otherwise this contract is null and void and purchasers deposit returned."

Settlement was to occur on March 7, 1983.

On February 5, appellant, the Suhs, and the Suhs' ac-countant met with Ms. Harris, who reviewed the Suhs' financial affairs and, according to appellant, said that she "foresaw no foreseeable problem" with a transfer of the lease. Several days later, appellant called Mr. Frank and was again assured that "as far as I know everything is okay." On February 21, however, Frank informed appel-lant that he had changed his mind and intended to "negoti-

ate his own lease." Frank confirmed that two days later, telling appellant that he would neither transfer the lease nor renew it. He said that he would regard the extra amount already paid for the February rent (the difference between $1,658 and $1,700) as an overpayment that would be refunded. Later that day, Ms. Harris delivered a 30–day eviction notice directing appellant to vacate the premises by the end of March.

Faced with this turn of events, appellant was forced to renegotiate his contract with the Suhs. On March 7, 1983, a new contract was signed, calling for a purchase price of $15,000 (rather than $70,000) plus the inventory at appellant's cost. Appellant vacated the premises on March 25. The "overpayment" for February was credited against his March rent.

### (1) Breach of Contract

Count I of appellant's amended complaint stated two alternative causes of action—one, that the landlord had effectively renewed the lease which it then breached, and, two, that appellant became a holdover tenant under the prior lease and that, somehow, the landlord breached that lease. The only remedy sought was money damages for the breach. In response to a special verdict sheet, the jury found that appellant had a contract of lease with the landlord, that the landlord breached that contract, and that appellant sustained damage as a result. In Count II, appellant asserted that the landlord had agreed to permit the renewed lease to be assigned to a qualified buyer, that that agreement was supported by consideration (appellant's renewal of the lease), that appellant produced a qualified buyer whom the landlord found acceptable, and that the landlord thereafter breached that agreement by declining to renew the lease and permit an assignment. As with Count I, the only remedy sought was money damages. The jury specifically found that there *was* a contract to assign the lease and that the landlord breached it.

It is evident, from both the amended complaint and the evidence, that these two counts are related. The key to

both is whether the landlord, through its agents, effectively *and enforceably* renewed the lease, other than on a monthly basis, beyond January 31, 1983. If not, as the landlord contends, not only would Count I fall but Count II as well, for absent an enforceable renewal, there would be nothing that appellant could assign.

The evidence viewed in a light favorable to appellant clearly suffices to establish an agreement between the parties to renew the lease on the terms set forth in the document delivered to appellant in mid-January. Because neither that document nor any other pertaining to it was ever signed by the landlord, however, the Statute of Frauds is implicated. Md.Code Ann. Real Prop. art., §§ 5–101 and 5–102 provide that a leasehold interest in land for a term of one year or more that is not in writing and signed by the party creating it "has the force and effect of an estate or interest at will only, and has no other or greater force or effect, either in law or equity." See also § 5–103, providing that a leasehold estate may not be granted unless in writing signed by the grantor, and § 5–104 precluding any action brought on a contract for the disposition of any interest in land unless the contract or some memorandum of it is in writing signed by the party to be charged.

Appellant relies on the doctrine of "part performance" to escape the bar of these provisions. That doctrine is succinctly stated in Restatement (Second) of Contracts § 129:

> "A contract for the transfer of an interest in land may be specifically enforced notwithstanding failure to comply with the Statute of Frauds if it is established that the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement."

As pointed out in Comment a to § 129, application of the doctrine and thus enforcement of a contract declared unenforceable by the statute,

"has ... been justified on the ground that repudiation after 'part performance' amounts to a 'virtual fraud.' A more accurate statement is that courts with equitable powers are vested by tradition with what in substance is a dispensing power based on the promisee's reliance, a discretion to be exercised with caution in light of all the circumstances."

Where the "defense" of part performance is raised, the dispute often concerns the nature and quality of the performance—whether it so relates to and furnishes evidence of the oral agreement as to justify a court in effectively excusing compliance with the statute. *See Boehm v. Boehm,* 182 Md. 254, 34 A.2d 447 (1943); *Beall v. Beall,* 291 Md. 224, 434 A.2d 1015 (1981); *Campbell v. Welsh,* 54 Md.App. 614, 460 A.2d 76 (1983), and cases cited therein. That is how the dispute is portrayed here, appellant contending that his payment of $1,700 in rent for February constitutes sufficient part performance, appellees contending that it does not. In point of fact, however, that issue is quite irrelevant in this case.

■ The law is clear and well established that "part performance" is an equitable doctrine available only where the principal relief sought is specific performance of the oral agreement. It has no application in an action at law for money damages. *See Hamilton v. Thirston,* 93 Md. 213, 219, 48 A. 709 (1901); *Stevens v. Bennett,* 234 Md. 348, 352, 199 A.2d 221 (1964); *Mangione v. Braverman,* 234 Md. 357, 360, 199 A.2d 225 (1964); *Kline v. Lightman,* 243 Md. 460, 472, 221 A.2d 675 (1966); Restatement (Second) of Contracts § 129, comment c. Nor has the recent merger of law and equity *procedure* in this State changed that principle. As Professor Corbin states, 2 Corbin on Contracts § 422, at 456:

"The rule that part performance may make a contract for the sale of land specifically enforceable was the creation of the courts of equity and was not recognized at common

law. The result of this is, *even in jurisdictions where law and equity are combined,* that a suit solely for damages, or other purely common law remedy, for breach of the express contract is generally not maintainable, however greatly the plaintiff may have changed his position in reliance on the contract and however unjust it may be for the defendant to make use of the statute in defense."
(Emphasis added.) [1]

■ As Counts I and II of the amended complaint sought only money damages and not any equitable relief, the part performance asserted by appellant, whether or not it would suffice to justify specific performance or ancillary equitable relief, does not bar application of the Statute of Frauds in this case. For that reason, we conclude that the trial court did not err in granting judgment N.O.V. on those two counts.

### (2) Malicious Interference With Contractual Relationship

■ In Count III of his amended complaint, appellant contended that, in wrongfully breaching its agreement to permit appellant to assign the renewed lease to the Suhs, the landlord (and its agents) intentionally and maliciously interfered with appellant's existing contract with the Suhs. Although the count was scantily drawn, the theory seemed to be that, by reneging on the agreement to renew and permit assignment of the lease, the defendants deliberately and wrongfully precluded appellant from satisfying the contingency in his first contract with the Suhs, to his ultimate economic disadvantage.

There was evidence sufficient to support those allegations. Again, taken in a light most favorable to appellant, the evidence showed that (1) the landlord had in fact agreed to renew the lease and to permit its assignment by appel-

---

1. We are aware of no case in any State that has merged its law and equity procedure holding that the doctrine of part performance applies in an action solely for money damages and thus have no basis for concluding that Professor Corbin's statement is not correct.

lant to the Suhs, (2) through Mr. Frank it then breached those agreements, and (3) that action was taken maliciously and with intent to injure appellant.

The evidence supporting that last element came primarily from Milton Korn, the broker who found the Suhs and helped negotiate the contract between them and appellant. Korn stated that, upon learning from appellant that a problem had developed in obtaining the new lease, he called Mr. Frank, who informed him "that under no circumstances would he give [appellant] a lease. He wants that man to walk out of that store without a dime." Korn continued:

"Then I spoke to Mr. Frank from the standpoint of giving the new—the purchasers a lease—them taking over the space, and at first he wouldn't do it, and I called him many, many times. Generally he was on vacation, or he was somewhere else. I tried to get ahold of his partner or associate, Mr. Hillman, and they wouldn't let me speak to him. It was almost a daily affair trying to get in touch with him.

Finally, I got ahold of Mr. Frank, and I asked him point blank—I said 'They [*sic*] people qualify. You have already qualified them. Will you give them a lease?'

'As long as Mr. Winternitz walks out with nothing.' " [2]

The tort at issue "as it exists in Maryland, has been described thusly: 'a third party who, without legal justification, intentionally interferes with the right of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party.' " *Orfanos v. Athenian, Inc.*, 66 Md.App. 507, 520, 505 A.2d 131 (1986), quoting from *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744 (1981). This description, we said, is not substantially different than that stated in the Restatement (Second) of Torts

---

**2.** There was also some evidence of a number of disagreements between Messrs. Winternitz and Frank over various aspects of the landlord-tenant relationship. Winternitz had at one point also operated a liquor store in the shopping center, which Frank found objectionable and forced Winternitz to discontinue. He also made Winternitz discontinue his State lottery agency.

§§ 766–67. In that regard, §§ 766A and 767 are particularly instructive.

Section 766A provides:

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him."

Section 767 continues:

"In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties."

In examining these principles in the context of this case, several things seem clear. First, § 766A, on its face, does not purport either to define or to limit the method of interference necessary to constitute that aspect of the tort. We see no reason why the refusal by the defendant to perform a legal duty owed to the plaintiff, including a contractual obligation, could not suffice in this regard. *Cf. Lake Shore Investors v. Rite Aid Corp.*, 55 Md.App. 171, 461 A.2d 725 (1983), *aff'd* 298 Md. 611, 471 A.2d 735 (1984). The key element is the fact of intentional and improper conduct that prevents or burdens performance by the plaintiff; the precise form of that conduct, including whether it

independently constitutes a breach of a separate contract between the plaintiff and defendant is important only in determining whether the conduct is of that quality. See § 767(a); also *Alyeska Pipeline Service v. Aurora Air Service,* 604 P.2d 1090 (Alas.1979); *Sade Shoe Co. v. Oschin & Snyder,* 162 Cal.App.3d 1174, 209 Cal.Rptr. 124 (1984).

■ That said, however, the law does not permit the conversion of every breach of contract into a tort action, merely because one effect of the breach is to prevent or hinder the plaintiff in carrying out his obligations under other contracts. The losses sustained as a result of that may, if foreseeable, be an element of damage in a breach of contract action, but that collateral effect does not, of itself, establish the tort. The other elements of the tort enumerated in § 767 that bear on the perniciousness of the defendant's conduct must also be taken into account.

Although conceding that a contract unenforceable by reason of the Statute of Frauds can be the subject of malicious interference (*see Daugherty v. Kessler,* 264 Md. 281, 286 A.2d 95 (1972)), appellees seem to base their defense of Count III on the notion that the breach of an unenforceable contract between the parties cannot constitute the kind of impermissible conduct required for the tort. They assume that, as the agreement to renew the lease was unenforceable, appellant had nothing to assign and that, after January 31, he had merely a month-to-month tenancy which the landlord was free to terminate on 30 days notice.

That defense overlooks, or at least disregards, the fact that, on competent evidence, a jury found that the parties did in fact agree to renew the lease and permit its assignment. There was, in other words, a valid contract to those effects which cannot be swept entirely aside. In *Daugherty,* though focusing on the contract that was interfered with, the Court made the point, at 285, 286 A.2d 95.

"An oral contract, like that before us, may be unenforceable as between the parties but between them and as to third parties may in various aspects have life, force and

**28**

effect. 2 *Corbin on Contracts*, § 279, The Legal Operation of the Statute of Frauds, pp. 20–21, says: 'A contract where the parties have not complied with the requirements of the statute is neither void nor voidable; it has much effect upon the legal relations of the contracting parties with each other and with third persons.' "

■ That principle, we think, has significance in this context as well. That appellant is precluded from collecting damages for breach of his contract with the landlord does not authorize the landlord to breach it, much less to breach it with the deliberate and malicious intent of sabotaging appellant's contract with the Suhs. The breach itself is culpable, though not directly remediable. What is both culpable and remediable is effecting the breach not for its own sake, to end the contractual relationship between appellant and the landlord, but for the deliberate, independent, and successful purpose of interfering with appellant's contract with the Suhs. As appellees do not challenge the existence of the other requisite elements of the tort or the instructions given by the court, we think that the jury was entitled to find the verdict it did on Count III and that the court erred in nullifying it.

JUDGMENT ON COUNTS I AND II AFFIRMED; JUDGMENT N.O.V. ON COUNT III REVERSED AND JUDGMENT ENTERED ON ORIGINAL VERDICT IN ACCORDANCE WITH MD. RULE 2–532(f)(1)(A); APPELLEES TO PAY THE COSTS.