812 P.2d 1129

**Richard PLATTNER,**
**Plaintiff–Appellant,**

**v.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation, Defendant–Appellee.**

**No. 1 CA–CV 89–091.**

Court of Appeals of Arizona,
Division 1, Department B.

May 28, 1991.

Thur, Dawson and O'Sullivan by Calvin C. Thur, Mark Stachon, Scottsdale, for plaintiff-appellant.

Richard Plattner, in pro. per.

Ridenour, Swenson, Cleere and Evans by James W. Evans, Eric B. Gonzalez, Phoenix, for defendant-appellee.

## OPINION

GRANT, Chief Judge.

This case raises the issue of whether an attorney can recover against an opposing party for interference with that attorney's relationship with his client, and whether the facts presented by the attorney here were sufficient to survive the opposing party's motion for summary judgment.

The plaintiff/appellant, Richard Plattner, (Plattner) appeals from the trial court's order granting summary judgment and attorneys' fees in favor of defendant/appellee, State Farm Mutual Automobile Insurance Company (State Farm) in this action for intentional interference with a contractual relation.

## PROCEDURAL HISTORY

Plattner, an attorney, was retained by Sharon and Louis Malloque (Malloques) to pursue a claim against State Farm for medical payments. Plattner filed a suit alleging breach of contract and tort bad faith. State Farm later decided to pay the balance of the medical benefits under the policy. Plattner refused to accept the payment because he believed that State Farm intended the payment to settle the entire lawsuit including the bad faith claim.

Less than three weeks before the scheduled trial date, discovery was closed. At this time, State Farm had not yet deposed either the Malloques or their expert witness, nor had State Farm designated an expert of its own. State Farm then asserted in a letter to Plattner that the earlier offer to pay all insurance benefits had been unconditional. Earlier, State Farm's attorney had written to Plattner suggesting that he should consider whether he could continue representing the Malloques if he intended to be a witness in the case.

Shortly thereafter, Plattner withdrew as counsel for the Malloques in order to testify that in his view the nature of the prior offer was conditional. Thus, the trial was delayed and discovery was re-opened. State Farm then deposed the Malloques and their expert, as well as adding an expert of its own. Fourteen months later, Mr. Malloque, having been stricken with cancer in the interim and fearful of dying

before the case concluded, reached a settlement of $40,000. Plattner then filed this suit. The trial court first denied State Farm's Motion to Dismiss made pursuant to Rule 12(b)(6), Arizona Rules of Civil Procedure, and then granted State Farm's Motion for Summary Judgment without elaboration. Plattner then filed this appeal.

## FACTS

This dispute originated in an insurance claim filed by Sharon Malloque. Malloque was involved in a car accident in 1984. A few months later, she filed a claim with her insurer, State Farm, alleging that she had developed further symptoms stemming from injuries received in the accident. After having the medical evidence evaluated by an independent medical expert and an independent evaluation team, State Farm accepted the claim but agreed to pay only part of the treatment costs. Displeased with this result, Malloque and her husband retained attorney Richard Plattner to pursue their claim.

On November 29, 1984, Plattner filed a complaint on behalf of the Malloques against State Farm, alleging breach of contract and bad faith based on State Farm's decision not to disburse the entire medical benefits amount. After Plattner had taken the medical expert's deposition, State Farm changed its position. Ralph Hunsaker, State Farm's attorney, wrote to Plattner, enclosing a check for the remainder of Malloque's medical benefits under the policy. The letter stated:

I am writing to inform you that State Farm has authorized me to offer to pay the medical pay coverage in this case, up to and including the $5,000 coverage, less $843 already paid under that coverage. If you and your client will let me know your wishes in this regard we can conclude this litigation.

Two days later, Neil Swiebel, State Farm's claim manager, wrote to Plattner:

Reference to Mr. Hunsaker's letter of March 19, 1985, we are pleased to enclose herewith our draft # 720 132 Q in the amount of $4,157.00, representing the balance of the available amount under insured's Medical Payment Coverage. The draft is made out to insured driver Malloque. Thank you for your cooperation.

No release was enclosed in the letter.

Four days later, Plattner telephoned Hunsaker apparently to clarify orally State Farm's intent in tendering the check. Plattner alleges that he called Hunsaker and asked him whether State Farm meant the $4,157.00 check as a "no-strings" offer, that is, as resolution of the medical claims coverage solely, or as an offer conditioned on Malloques' dismissal of the entire lawsuit, including the bad faith claim. Hunsaker apparently stated that he did not know State Farm's intent and told Plattner to call Swiebel. Plattner did so. The substance of this conversation is disputed. Plattner alleges that Swiebel informed him that State Farm intended the payment to settle the entire lawsuit. State Farm contends that Swiebel stated that State Farm hoped the medical payment would conclude the litigation, but did not condition the payment of the benefits on Malloques' agreeing to settle the bad faith claim. This dispute formed the basis of the Malloques' second potential claim for bad faith.

In any event, Plattner did not cash the check, but kept it in his file. On March 25, 1985, he wrote Hunsaker.

Thank you for your recent offer on behalf of State Farm to pay the special damages in the above referenced case. However, I think any settlement discussion will also need to take into account general damages, attorney's fees and the potential exposure for punitive damages. If State Farm wishes to resolve this matter immediately, I am authorized to accept the sum of $25,000 if received prior to the date when your client is due to answer Interrogatories.

Plattner also took Swiebel's deposition, and quotes part of it to support his version of the events:

Q: You offered it [the medical benefits payment] in full settlement of the entire amount claimed in the lawsuit; is that also correct?

. . . .

A: Yes, sir, the answer to your question is yes.

Shortly before the deposition, an article appeared in the June 1985 edition of the *Maricopa Lawyer* announcing the formation of a committee of attorneys handling bad faith cases against State Farm. Richard Plattner was listed as one to contact for additional information. A copy of this article was found in the Malloques' file maintained by State Farm, although it is unclear who had placed it there and when.

On December 12, 1985, Plattner deposed Manuel Mendoza, claim consultant for State Farm. During the deposition, it became clear to State Farm that Plattner was taking the position, based on his earlier telephone conversation with Swiebel and on Swiebel's deposition testimony, that the $5,000 offer was conditioned on the Malloques agreeing to settle the medical and original bad faith claim.

The day after the Mendoza deposition, Hunsaker wrote Plattner, disputing Plattner's suggestion that the $5,000 offer was contingent on the Malloques' settlement of the bad faith claim. He also stated that "[i]f you intend to be a witness about that telephone conversation [with Swiebel], then you may need to consider whether you can continue to serve as plaintiffs' attorney in this case."

One month later, Hunsaker wrote to Plattner, stating that State Farm "did not intend nor did any correspondence sent to you or your clients make any demands of your client or attach any strings to the offer to pay the remaining portions or all portions of the medical payment coverage."

Because both Hunsaker and Plattner could be called as witnesses concerning the March 1985 conversation, they withdrew as counsel. New counsel for State Farm and the Malloques settled the case sometime later for $40,000, and Plattner received 50% of the fees from the settlement.

Plattner filed his own suit against State Farm on December 17, 1987, alleging intentional interference by State Farm with Plattner's contract with the Malloques. He claimed that State Farm, acting through Hunsaker and Swiebel, contrived in December 1985 to misrepresent State Farm's intent concerning the settlement, (the basis for the second bad faith claim), knowing that State Farm could dispute the substance of the conversation later, and thereby force Plattner to become a witness and withdraw from the case.

Plattner posited two theories why State Farm wanted him off the case. First, he contended that State Farm had not completed its discovery in the Malloque case, and consequently wanted to remove Plattner from the case to gain discovery time while the case was stalled for new counsel. Second, he presented evidence of the *Maricopa Lawyer* article.

Plattner sought compensatory and punitive damages, as well as attorneys' fees. State Farm responded that a cause of action arose only when the interference was with the client, and that Plattner was responsible for his own removal. The trial court granted State Farm's motion for summary judgment without elaboration. The court also granted $5,000 in attorneys' fees to State Farm under A.R.S. § 12–349. Plattner appeals from these rulings and from a discovery ruling which will be discussed in more detail below.

## ISSUES

1. *Does Arizona recognize a cause of action for intentional interference which prevents an attorney's performance of his contract with his client?*

2. *Does Plattner's evidence that State Farm intentionally and wrongfully forced him to withdraw as counsel in the Malloque case preclude summary judgment for State Farm?*

3. *Did the trial court err by protecting documents from discovery based on the attorney/client privilege when the privilege had been waived by State Farm's failure to timely assert it?*

4. *Did the trial court abuse its discretion in awarding attorneys' fees under .A.R.S. § 12–349?*

## INTENTIONAL INTERFERENCE WITH ATTORNEY'S CONTRACT WITH CLIENT

Arizona has long recognized the tort of intentional interference with contractual relations. *See, e.g., Snow v. Western Savings & Loan Ass'n,* 152 Ariz. 27, 730 P.2d 204 (1986); *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025 (1985), and cases cited therein, 147 Ariz. at 386, 710 P.2d at 1041.

■ "Liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's rights under a contract with another if the interference causes the plaintiff to lose a right under the contract." *Snow,* 152 Ariz. at 34, 730 P.2d at 211 (citing *Restatement (Second) of Torts* § 766 (1979)). To plead a prima facie case of intentional interference with contract, the plaintiff must allege:

1) the existence of a valid contractual relationship;

2) knowledge of the relationship on the part of the interferer;

3) intentional interference inducing or causing a breach;

4) resultant damage to the party whose relationship has been disrupted; and

5) that the defendant acted improperly.

*Snow,* 152 Ariz. at 34, 730 P.2d at 211.

Arizona courts have found causes of action in a variety of contexts. For example, in *Snow,* the court found a cause of action in favor of a seller, where its lender changed the mortgage terms with reason to know that the new terms would cause the buyer to break the purchase agreement with the seller. 152 Ariz. at 37, 730 P.2d at 214. That same court found a cause of action in *Antwerp* in favor of the business against the Better Business Bureau for disseminating unfavorable reports of the business which reduced potential future sales. *Antwerp Diamond Exch. v. Better Business Bureau,* 130 Ariz. 523, 530, 637 P.2d 733, 740 (1981). And in *Wagenseller,* the court found that summary judgment was improper against an employee who claimed that her supervisor had interfered with her relationship with her employer by

generating unfair performance reports. 147 Ariz. at 388–89, 710 P.2d at 1043–44.

■ The only Arizona case addressing a claim for intentional interference with an attorney/client relationship is *State Farm Mutual Ins. Co. v. St. Joseph's Hospital,* 107 Ariz. 498, 489 P.2d 837 (1971). The intentional interference in *St. Joseph's* occurred when the insurer, State Farm, contacted its insured directly, knowing she was represented, and convinced her to discharge her attorney. The court affirmed the judgment for compensatory and punitive damages in favor of the attorney, reasoning that, while a client may discharge his attorney at any time,

> when a third person intentionally interferes with this contractual relationship for his own benefit, either by unlawful means or by lawful means where there is a lack of sufficient justification, by inducing a client to terminate the relationship with his attorney or otherwise act with the intent to deprive the attorney of his remuneration, a cause of action arises in tort for the damages resulting from that act.

107 Ariz. at 502, 489 P.2d at 841.

State Farm argues that, under *St. Joseph's,* a cause of action in the context of an attorney/client relationship exists only where the interference induces the client, not the attorney, to sever the relationship or to otherwise deprive the attorney of his remuneration. While this may be the typical scenario in the attorney/client context, we nevertheless reject State Farm's narrow reading of *St. Joseph's.* Although the facts of *St. Joseph's* were such that it was the client who was induced to break the contract, and not the attorney who was prevented from performing it, there is nothing in the opinion which suggests that this is the only set of circumstances under which the tort can be found in the attorney/client context.

Significantly, the language used to define the elements of the tort of intentional interference with contract in the more recent cases does not limit the cause of action to a particular party to a contract. *Snow,* 152 Ariz. at 34, 730 P.2d at 211; *Wagensel-*

*ler*, 147 Ariz. at 386, 710 P.2d at 1041. Further, we note that section 766A of the *Restatement (Second) of Torts* (1979), a companion to *Restatement* § 766 (*cited with approval* in *Snow*, 152 Ariz. at 34, 730 P.2d at 211, and *Wagenseller*, 147 Ariz. at 387, 710 P.2d at 1042), specifically provides for the cause of action asserted by Plattner. Section 766 A provides:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

This section has been interpreted to provide a cause of action for those who are unable to perform their contractual obligations because of a third party's interference, a situation analogous to an attorney being prevented by the act of another from representing his client. *See, e.g., Winternitz v. Summit Hills*, 73 Md.App. 16, 25–27, 532 A.2d 1089, 1093–94 (1988); *Woody v. Tamer*, 158 Mich.App. 764, 775 n. 1, 405 N.W.2d 213, 218 n. 1 (1987).

Viewed in this light, the tort alleged here is similar in theory to that addressed in earlier Arizona cases. In *Snow*, the plaintiffs were wrongfully prevented from providing their property for sale at the agreed-upon terms. In *Wagenseller*, the plaintiff was unfairly prevented from providing her services as an employee. In *Antwerp*, the plaintiff was unjustly hampered in its efforts to provide goods and services to the public at large.

Based on *Restatement* § 766 A, and the broad definition accorded the tort of interference with business relations as defined by our supreme court, we hold that an attorney may have a cause of action for the tort even when the interference is directed at the attorney and not at the client.

## SUMMARY JUDGMENT

New standards for adjudicating motions for summary judgment were recently adopted by the Arizona Supreme Court in *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990). There the court stated that "motions for directed verdict and for summary judgment serve the same purpose of expediting the business of the court by removing meritless claims." *Id.* at 309, 802 P.2d at 1008. Therefore, the court held that "the same standards should apply in determining whether to grant either motion," *id.*, and cited with favor the dissent of Justice Black in *Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943), wherein he stated that a "verdict should be directed if at all, only when, without weighing the credibility of the witnesses, there is in the evidence no room whatever for honest difference of opinion over the factual issues in controversy." *Orme School*, 166 Ariz. at 308–09, 802 P.2d at 1007–08, quoting *Galloway*, 319 U.S. at 407, 63 S.Ct. at 1096 (Black, J., dissenting). The Arizona Supreme Court went on to hold that

> although the trial judge must evaluate the evidence to some extent in ruling on a motion for summary judgment, the trial judge is to apply the same standards as used for a directed verdict. Either motion should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense. Thus assuming discovery is complete, the judge should grant summary judgment if, on the state of the record, he would have to grant a motion for directed verdict at the trial. (Citations and footnotes omitted.)

*Id.* 166 Ariz. at 309, 802 P.2d at 1008.

The *Orme School* court issued a final warning that "summary judgment should not be used as a substitute for jury trials simply because the trial judge may believe the moving party *will* probably win the jury's verdict, nor even when the trial judge believes the moving party *should* win the jury's verdict." *Id.* at 310, 802 P.2d at 1009 (emphasis in original). Bearing this new standard in mind, we turn to

the summary judgment on the facts as presented in this case.

Plattner claims that his evidence that State Farm intentionally and wrongfully forced him to withdraw as counsel in the Malloque case precludes summary judgment for State Farm.

We have determined that the tort of intentional interference with contract applies to attorney-client fee contracts. It is undisputed that Plattner and the Malloques had a valid contractual relationship and that State Farm knew of that relationship. Thus, the first two elements of intentional interference are shown by the evidence. In addition, it is undisputed that Plattner lost fifty percent of the legal fee he would otherwise have earned in the Malloque case. Thus, the damages element required for an intentional interference claim is satisfied. It is the third element, whether the interference induced the breach, and the fifth element, whether the defendant's actions were improper, which are disputed.

State Farm argues that Plattner failed to produce any evidence that it induced or caused Malloque to deprive Plattner of his attorneys' fees. Rather, State Farm claims, Plattner had to withdraw from representation of the Malloques because he became a witness in their bad faith claim against State Farm. When Plattner was forced into the role of a witness as to State Farm's earlier refusal to unconditionally pay the medical coverage benefits it owed, he withdrew from the case and the Malloques retained the firm of Harris & Palumbo as substitute counsel. Approximately fourteen months later, the lawsuit between Malloques and State Farm settled for $40,000. During this period, as a result of additional discovery, the Malloques obtained Swiebel's claim activity log which confirmed that the offer was conditioned on settlement of the entire lawsuit. Plattner argues that this constituted proof that State Farm had failed to unconditionally tender the balance of the medical payments and had lied about this, presumably to delay the trial and force Plattner to become a witness.

As to this issue, State Farm counters that the trial court correctly granted summary judgment in its favor because Plattner failed to present evidence that State Farm had acted in any way to force the *client* Malloques to withdraw from the relationship with Plattner. According to State Farm, in order for an act to be intentional interference with the attorney/client relationship, the attorney must show that the defendant induced the client to terminate the relationship or to otherwise act with the intent to deprive the attorney of his remuneration. We disagree.

It is just as wrongful to intentionally cause an attorney to terminate a contractual relationship as it is to cause the client to do so.

In *Wagenseller*, the court held that [w]hether a particular action is improper is determined by a consideration of seven factors [set forth in Restatement (Second) of Torts § 766]:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Wagenseller*, 147 Ariz. at 387, 710 P.2d at 1042. Further, the court stated: "If [an] interferer is to be held liable for committing a wrong, his liability must be based on more than the act of interference alone. Thus, there is ordinarily no liability absent a showing that defendant's actions were improper as to motive or means." *Id.* at 388, 710 P.2d at 1043. Although *Restatement* § 766 was not cited to the trial court, the theory of wrongfulness was. Plattner claims that reasonable inferences from the facts presented are that State Farm was ill-prepared for trial in the Malloque case and was angry with Plattner for forming a group of attorneys to share information in bad faith cases against it. Further, Platt-

ner argues, State Farm realized it could force him to become a witness in the case by creating a factual dispute about the conversation between Plattner and Swiebel regarding the tender of medical benefits due. According to Plattner, this would cause the trial to be postponed and provide for re-opening of discovery so that State Farm could complete the discovery it had failed to conduct. Thus, Plattner concludes, State Farm had everything to gain and nothing to lose.

State Farm denies that it intentionally interfered with the attorney-client relationship. It does not so much dispute the facts but disputes the inferences which Plattner claims could be drawn from those facts. State Farm takes the position that Plattner never should have spoken directly with its agent, Swiebel, because it is that act which caused Plattner to become a witness and which forced him to withdraw as attorney in the case. We note, however, that Plattner's call to Swiebel was in response to a draft in the amount of $4,157.00 to Plattner with an equivocal statement about what the amount represented. Plattner first spoke with Hunsaker, State Farm's attorney, before calling Swiebel directly.

Relying on the standards for summary judgment as set forth in *Orme School,* we find that a trier of fact could have reasonably drawn from the facts the inferences that Plattner suggests. Thus, we cannot say that the facts produced in support of the plaintiff's claim have "so little probative value ... that reasonable people could not agree with the conclusion advanced by the [plaintiff]." *Orme School,* 166 Ariz. at 309, 802 P.2d at 1008. Therefore, summary judgment was improper.

### DISCOVERY ISSUE

Plattner filed a Request for Production of Documents on December 24, 1987 which included the following item:

> 10. All files from each of defendant's offices pertaining to the Malloque case after suit was filed, including all pleadings, motions, depositions, and other discovery documents, correspondence of any kind, including that with defendant's attorneys, and documents pertaining to settlement of the case.

State Farm then filed a Motion for Protective Order listing as grounds relevancy, overbroadness and undue burden. The trial court granted State Farm's motion as to certain items but denied the motion as to Item 10. State Farm then filed a Motion for Clarification in which it raised for the first time an objection to producing correspondence to and from its attorneys based on the attorney/client privilege. Although the trial court found that State Farm had failed to timely assert the attorney/client privilege, it nevertheless allowed State Farm to raise this objection. Following an *in camera* inspection, the court ordered State Farm to produce three letters between State Farm and its counsel. The court found the remainder of the correspondence to be "innocuous or irrelevant to the case."

■ State Farm first argues that this court has no jurisdiction to consider this issue because the court may not "review matters not contained in the Notice of Appeal." In support of this argument, State Farm argues that the notice of appeal was from the order and judgment of the trial court and not from any discovery orders. Plattner claims that his appeal from the final judgment necessarily includes the non-appealable minute entries regarding discovery. We agree with Plattner. The scope of review from a final judgment is stated in A.R.S. § 12–2102 A as follows:

> Upon an appeal from a final judgment, the supreme court shall review any intermediate orders involving the merits of the action and necessarily affecting the judgment, and all orders and rulings assigned as error, whether a motion for new trial was made or not.

The discovery order is an order "involving the merits of the action and necessarily affecting the judgment." Thus, this court has jurisdiction to review the trial court's ruling on discovery *Weller, Inc. v. Aetna Casualty & Surety Co.,* 126 Ariz. 323, 327, 614 P.2d 865, 869 (App.1980); *Pepsi–Cola Metropolitan Bottling Co. v. Romley,* 118

Ariz. 565, 568, 578 P.2d 994, 997 (App. 1978).

We turn to the merits. State Farm admits producing all correspondence between State Farm and its counsel regarding State Farm's intent in tendering the medical payment benefits. State Farm claims, however, that it did not waive the attorney/client privilege with respect to other subject matters.

To the contrary, Plattner argues, State Farm waived the attorney/client privilege because it failed to raise that ground in its earlier motion for protective order. He further argues that the error, as a matter of law, cannot be presumed to be harmless since neither State Farm nor the court has ever provided Plattner with a list of the correspondence that was reviewed *in camera.*

 At the outset, we reject Plattner's argument that this court cannot adequately review the trial court's decision concerning the correspondence for the reason that he has not been provided a list of that correspondence. The trial court ruled that it would seal the correspondence provided to it by defendant that had not been sent to plaintiff's counsel so that this court could review it for an abuse of discretion. That packet is not part of the record on appeal. It was Plattner's burden to see that all documents necessary to his arguments on appeal were made part of the record on appeal. *See, e.g., Renner v. Kehl,* 150 Ariz. 94, 97 n. 1, 722 P.2d 262, 265 n. 1 (1986). Because Plattner has failed to provide this court with that portion of the record, we must presume that sufficient evidence supported the trial court's ruling as to which documents were pertinent. *Auman v. Auman,* 134 Ariz. 40, 42–43, 653 P.2d 688, 690–91 (1982).

 Thus, the only question remaining is whether the trial court had discretion to reconsider its earlier ruling on the denial of the motion for protective order. A trial court has broad discretion in matters of discovery, and its decision will not be disturbed absent a showing of abuse. *Brown v. Superior Court,* 137 Ariz. 327, 331, 670 P.2d 725, 729 (1983). Certainly, a trial court has discretion to reconsider its earlier decisions on discovery requests, especially when those requests threaten to infringe on privileged materials. The method chosen by the trial court here to preserve essential privileged matters has been approved by our appellate courts. *See, e.g., Picture Rocks Fire District v. Updike,* 145 Ariz. 79, 81, 699 P.2d 1310, 1312 (App. 1985). Consequently, we find no error on this point.

## ATTORNEYS' FEES

After winning the motion for summary judgment, State Farm moved for $25,000 in attorneys' fees, on the basis of both A.R.S. § 12–341.01 and A.R.S. § 12–349. The trial court awarded $5,000 in fees to State Farm pursuant to A.R.S. § 12–349. In a later minute entry, the trial court explained that the "claim was brought without substantial justification in that it was groundless and frivolous in the extreme."

Plattner argues on appeal that even if the summary judgment award is affirmed on appeal, the award of attorneys' fees cannot stand. He again argues that the court's ruling is inconsistent with its earlier denial of the motion to dismiss, and that the trial court abused its discretion in acting as a trier of fact. State Farm responds that the denial of the motion to dismiss did not preclude the court from later finding that the case was frivolous and that Plattner's claims have been outrageous from the start. Neither party requests fees on appeal.

Based on our decision to reverse the trial court's ruling on State Farm's summary judgment motion, we find that the trial court abused its discretion in awarding fees pursuant to A.R.S. § 12–349.

## CONCLUSION

The trial court erred in granting summary judgment in this case because disputed issues of material fact remain to be resolved by the trier of fact, and the court's award of attorneys' fees below is consequently reversed. However, we affirm the trial court's decision to withhold

from discovery some documents on the basis of the attorney/client privilege. Reversed in part, affirmed in part, remanded.

LANKFORD, J., concurs.

JACOBSON, Presiding Judge, dissenting:

There is no dispute over the operative facts. Plattner represented the Malloques in an action against State Farm. The action was in two counts: breach of contract for failure to pay medical benefits under an automobile liability insurance policy and a bad faith tort claim. The underlying facts giving rise to this action arose out of an automobile accident in which Sharon Malloque suffered injuries. The Malloques' State Farm policy had $5,000.00 in medical payment coverage. In October 1984, Neil Swiebel, a State Farm claims representative, sent a check to the Malloques in the sum of $843.00 together with a copy of Dr. Larry Kaufman's report that supported this payment. On November 29, 1984, this action was commenced.

During the course of this litigation, Dr. Kaufman's deposition was taken. Based upon a summary prepared by Ralph Hunsaker, State Farm's attorney, State Farm authorized Hunsaker to pay the balance of the medical payment benefits to the Malloques. Hunsaker wrote to Plattner on March 19, 1985:

> I am writing to inform you that State Farm has authorized me to offer to pay the medical pay coverage in this case, up to and including the $5,000 coverage, less $843 already paid under that coverage. If you and your client will let me know your wishes in this regard we can conclude this litigation.

On March 21, 1985, Swiebel wrote Plattner:

> Reference to Mr. Hunsaker's letter of March 19, 1985, we are pleased to enclose herewith our draft # 720 132 Q in the amount of $4,157.00, representing the balance of the available amount under insured's Medical Payment Coverage.

No releases were included in either letter.

On or about March 25, 1985, Plattner called Hunsaker concerning State Farm's intent as to what the draft was supposed to cover. Hunsaker allegedly referred Plattner to Swiebel for clarification. Plattner then called Swiebel, and Swiebel allegedly told Plattner that the draft was tendered as a complete settlement of all claims against State Farm, including the bad faith claim. On December 12, 1985, during the deposition of Manuel Mendoza, claims consultant for State Farm, Plattner attempted to establish that State Farm had tendered the medical payment conditioned upon settlement of the bad faith claim. Hunsaker objected to this line of questioning as assuming facts not true, and stated that State Farm had tendered the balance of medical payment coverage "with no strings attached." Hunsaker followed this by a letter on January 16, 1986 to Plattner asserting that State Farm's tender of medical payments was never conditional.

Plattner withdrew from representation of the Malloques because he was a witness to the conversation between himself and Swiebel, which he contended would establish a second claim for bad faith against State Farm. Prior to his withdrawal, Plattner had offered to settle the litigation for $25,000.00. State Farm subsequently settled the matter with the Malloques' substitute counsel for $40,000.00.

Plattner then sued State Farm for intentional inference with his contractual relationship with the Malloques. The trial court granted summary judgment against Plattner and assessed attorneys' fees against him under A.R.S. § 12–349.

State Farm argues that, in the area of attorney/client relationships, the only recognized cause of action for intentional interference with contractual relationships is when the *client* is induced to breach the contract. *State Farm Mutual Ins. Co. v. St. Joseph's Hosp.*, 107 Ariz. 498, 489 P.2d 837 (1971). However, I concede that a cause of action might arise where a third party prevents an attorney from performing his contractual obligations. *See Restatement (Second) of Torts*, § 766A (1979). I will therefore analyze Plattner's cause of action based upon an analysis of that section.

Section 766A provides, in part:

One who *intentionally and improperly* interferes with the performance of a contract ... between another and a third person, by preventing the *other* from performing the contract ... is subject to liability to the other for the pecuniary loss resulting to him.

(Emphasis added.) Because I believe that Plattner did not introduce evidence that State Farm "intentionally and improperly" prevented him from performing his contractual relationship with the Malloques, I believe summary judgment was proper under any standard.

Plattner alleges that the interference occurred, in part, because Hunsaker was unprepared for trial. Therefore, according to Plattner, in March 1985, State Farm had Hunsaker write an ambiguous letter to Plattner tendering the medical payment check. In the meantime, Swiebel would write an equally ambiguous letter to Plattner enclosing the check. Knowing Plattner would call Hunsaker to clarify the ambiguity, Hunsaker would refer him to Swiebel who would tell Plattner the tender was conditional.

Then, in January 1986, State Farm instructed Hunsaker to spring the trap previously set by informing Plattner that the tender was not conditional, thus requiring Plattner to become a witness and cause him to withdraw. Unfortunately, neither Plattner nor the majority indicates how State Farm knew in March 1985 that Hunsaker would be unprepared to go to trial ten months later so as to at that time lay the groundwork for the later intentional interference.

More importantly, as comment (a) to § 766A makes clear: "In order for the actor to be held liable, this Section requires that his interference be improper." The majority opinion is not clear as to what act of State Farm constituted improper interference. Presumably, it was the act of Hunsaker contending that the tender of the medical payment check was unconditional, which in turn forced Plattner to prove that the tender was conditional. The simple fact of the matter is that Plattner placed himself in the position of being a witness to an alleged act of bad faith by State Farm. Plattner hoped to use that alleged act to obtain monetary damages on behalf of his client from State Farm. There is nothing improper on the part of State Farm, before it parts with its money, requiring the proof of the act. If that proof required Plattner to become a witness and thus withdraw as counsel, that was simply the price to be paid.

In assessing the evidence in a pre–*Orme School* context, the trial court not only found that summary judgment was warranted, but also granted attorneys' fees against Plattner because the claim was "groundless and frivolous in the extreme." I agree. I would affirm the grant of summary judgment and the trial court's award of attorneys' fees against Plattner. I would also award State Farm its attorneys' fees on appeal based upon the frivolousness of this appeal.