83 P.3d 560

SAFEWAY INSURANCE COMPANY,
INC., a foreign corporation,
Plaintiff–Appellant,

v.

Peter A. GUERRERO, individually, Peter A. Guerrero, P.C., an Arizona professional corporation; Charles D. Roush, individually, Charles D. Roush, P.C., an Arizona professional corporation; and Roush, McCracken, Guerrero & Miller, Attorneys at Law, a partnership of professional corporations, Defendants–Appellees.

No. 1 CA–CV 02–0661.

Court of Appeals of Arizona,
Division 1, Department B.

Jan. 27, 2004.

See also, 39 P.3d 538, 66 P.3d 74.

Parrillo, Weiss & O'Halloran By Ronald E. Huser, Tempe, Attorneys for Plaintiff–Appellant.

Turley, Swan & Childers, P.C. By Kent E. Turley, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

BARKER, Judge.

¶ 1 If a lawyer allegedly negotiates a *Damron/Morris*[1] agreement in violation of the permissible boundaries for such agreements, is that lawyer immune as a matter of law from a tort claim for intentional interference with contractual relations? Our answer to that question is "No."

¶ 2 The thrust of this lawsuit is an insurer's claim that lawyers representing a third-party plaintiff stepped outside the legal boundaries for *Damron/Morris* agreements and purposefully implemented a scheme to "manufacture" a bad faith claim in order to generate a multi-million dollar recovery instead of collecting on a $15,000 motor vehicle policy. For the reasons that follow, we reverse the trial court's grant of summary judgment on this claim.

### *I.*

### *Pertinent Facts and Procedural History*

¶ 3 Safeway Insurance Company, Inc. ("Safeway") appeals from the summary judgment granted by the superior court on its claim of intentional interference with contractual relations. We view the facts in a light most favorable to the party, Safeway, against whom the summary judgment was granted. *Hartford Accident & Indem. Co. v. Federal Ins. Co.*, 172 Ariz. 104, 107, 834 P.2d 827, 830 (App.1992). We have dealt with related aspects of this case, as we discuss below, in *Himes v. Safeway Insurance Company*, 205 Ariz. 31, 66 P.3d 74 (App.2003). We take judicial notice of that opinion. The parties have also asked that we take judicial notice of the Order and Opinion of the federal district court in *Safeway Insurance Company v. Botma*, No. CIV–00–553–PHX RCB (D.Ariz.

---

1. As we explained in *Himes v. Safeway Insurance Company*, 205 Ariz. 31, 34 n. 2, ¶ 1, 66 P.3d 74, 77 n. 2 (App.2003), "we utilize the term '*Damron/Morris*' agreement, *e.g. Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969) and *United Servs. Auto Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987), to refer to any agreement between a third-party claimant and insured whereby the insured consents in any fashion to liability and enters into an agreement providing the third-party claimant with the insured's breach of contract and bad faith claims against the insurer in exchange for a covenant not to execute against the insured."

Mar. 7, 2003), *appeal docketed,* No. 03–16020 (9th Cir. May 22, 2003) (*"Botma I "*). We agree with this request and draw upon that decision in our recitation and understanding of the facts pertinent to this case.[2]

¶ 4 This action has its genesis in an automobile accident in which Holly Castano was severely injured. Steven Botma ("Botma") was the driver of the vehicle. Patrica Himes ("Himes") is the mother and guardian of Holly Castano. Himes sued Botma for his alleged negligence in causing Holly Castano's injuries.

¶ 5 Appellees Peter A. Guerrero and Charles D. Roush are attorneys whose professional corporations are members of the appellee law firm, Roush, McCracken, Guerrero & Miller (collectively "Roush"). Roush represented Himes in her suit against Botma. Botma is a Safeway insured. His policy with Safeway provided coverage limits of $15,000 per person with a total of $30,000 per accident.

¶ 6 By any account Holly Castano's injuries were extremely severe. As we stated in *Himes:*

> Without attempting to fully describe her injuries, we note that Castano suffered a diffuse axonal injury to her brain which resulted in spastic quadreparesis. She has no use of her left arm or leg. She can slightly move her right leg and has limited use of her right arm. She has the ability to communicate but suffers distorted long term and short term memory problems. Some evidence put the cost of her past and projected medical care at $7 million.

205 Ariz. at 35, ¶ 2, 66 P.3d at 78.

¶ 7 Plainly, the difference between the extent of the injuries (past and projected medical costs in excess of $7 million) and the extent of the insurance coverage ($15,000 per person) is dramatic. To generalize,[3] Himes (through Roush) made a settlement offer that included a demand of policy limits in the amount of $15,000. Safeway contended that it accepted the offer. Himes, however, withdrew the offer. Himes contended that the offer was not accepted by Safeway. The issue of whether the case was in fact settled was tried to a jury. The jury agreed with Himes and, in a memorandum decision, we upheld that decision. *Himes v. Safeway Ins. Co.,* 205 Ariz. 31, 66 P.3d 74 (Ariz.App. 2003) (*"Himes Memorandum "*).

¶ 8 After the jury determined that there had in fact been no policy limits settlement, Botma and Himes entered into a *Damron/Morris* agreement for $12 million on the theory that Safeway had breached its duty of giving equal consideration to Botma's interest with regard to the policy limits demand. At that point, the litigation took two different directions. The reasonableness of the amount was approved by the state trial judge and appealed to this court. We reversed that decision in *Himes.* The question of whether there was a bad faith failure to give equal consideration to Botma's interest was raised in the federal district court action. The federal district court found that it was Himes who had "backed out" of the policy limits settlement discussions. *Botma I,* slip op. at 45. It found no breach of any duty on the part of Safeway. *Id.* It noted that "[w]hether an actual 'settlement' occurred is not material to the fact that there were clearly good faith negotiations proceeding

---

**2.** While the parties agree that we take judicial notice of the decision, they make differing arguments about the extent to which the decision is binding upon either this court or the parties. The decision is under appeal. We need not resolve the dispute about the precise effects of the decision. We utilize it as a statement of the factual record in determining whether it was appropriate for the trial court here to grant summary judgment.

Likewise, there is a dispute between the parties about whether this matter is properly proceeding as a motion for summary judgment (Roush's position), or rather, as a motion to dismiss (Safeway's position). Because we determine that Safeway is entitled to relief even if we adopt Roush's position on the procedural posture of the motions, we do not need to resolve this issue either.

**3.** This case (in the context of the related case filings) has an extensive factual and procedural history. We do not attempt to set forth a complete recitation of that history, but focus on facts pertinent to our inquiry. Some key facts are presented in more detail in ¶¶ 46–51, *infra.* For a more extensive rendition of certain aspects *see Botma I,* slip op. at 7–19; *see also Himes,* 205 Ariz. at 35–36, ¶¶ 3–8, 66 P.3d at 78–79.

throughout this period, and that the parties were moving in concert toward a resolution." *Id.* The federal district court's judgment, granting Safeway's motion for summary judgment on the bad faith claim, is presently on appeal.

¶ 9 As described below, it is Roush's alleged conduct, with regard to the *Damron/Morris* agreement and eventual bad faith claim, that is the subject of this action. While the state and federal court proceedings referenced above were pending, Safeway filed a separate claim against Roush for intentional interference with contractual relations. Safeway alleged that Roush realized that under the $15,000 per person policy in place for Botma, Roush would only be able "to collect a very modest fee." Accordingly, as the claim goes, Roush "devised a scheme that would allow them [the lawyers] to make a substantially larger fee." [4] The alleged scheme was that Roush "manufactured through their misconduct in settlement negotiations" a bad faith claim that would induce Botma to enter into a *Damron/Morris* agreement and assign his claims against Safeway to Himes. A necessary consequence of the alleged scheme "was to intentionally interfere with the contract" between Safeway and Botma.

¶ 10 Roush's alleged misconduct is set forth in detail in Part VI(B) of this opinion. *Infra* at ¶¶ 46–51. In short, the claim is that the settlement offer was *made* by Roush and then *withdrawn* by Roush (after Safeway believed it had accepted the offer) for the purpose of manufacturing a bad faith claim by contending that Safeway did not give equal consideration to the settlement offer.

¶ 11 Roush filed a motion for summary judgment with regard to Safeway's claim. [5] Roush asserted that Safeway's theory was "inventive but frivolous." Roush alleged that to allow Safeway's claim to proceed would be contrary to Arizona law allowing insureds to enter into *Damron/Morris* agreements.

Roush further claimed that Safeway was attempting to "obstruct an insured's exercise of this right" by seeking liability against counsel for "pursuing and agreeing to a *Damron/Morris* agreement." Finally, Roush claimed immunity from suit asserting that claims against lawyers in such situations are limited to claims of malicious prosecution and wrongful institution of civil proceedings ("WICP").

¶ 12 The trial judge agreed with Roush. She granted the motion for summary judgment. Without elaborating, she indicated that "based on the undisputed facts, plaintiff's complaint fails as a matter of law." Safeway appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## II.

### The Issues

¶ 13 We review de novo a trial court's ruling that a party is entitled to summary judgment as a matter of law. *Collette v. Tolleson Unified Sch. Dist. No. 214,* 203 Ariz. 359, 361, ¶ 2, 54 P.3d 828, 830 (App.2002). We view the issues in this fashion:

(1) As a matter of law, are lawyers immune from suit for intentional interference with contractual relations?

(2) As a matter of law, can there be a claim for intentional interference with contractual relations when the interference at issue was made to effectuate a *Damron/Morris* agreement but constitutes conduct allegedly outside the permissible boundaries for such agreements?

(3) Is there a question of fact in this case that precludes entry of summary judgment?

After addressing some foundational principles, we take each issue in turn.

---

4. Generating a larger fee, in a contingency fee case, is simply a by-product of "maximizing recovery" for the client. As we discuss at ¶ 52 *infra,* this pursuit is bounded by the applicable legal and ethical rules.

5. The motion was filed as a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." As we mentioned above, *supra* n. 2, Safeway contends there was error in treating this as a motion for summary judgment on procedural grounds but we need not reach that issue.

### III.

### The Tort of Intentional Interference with Contractual Relations

■ ¶ 14 As described in *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 493, ¶ 74, 38 P.3d 12, 31 (2002), the tort of intentional interference with contractual relations has five elements:

A prima facie case of intentional interference requires: (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly.

The tort has been described by our supreme court as "long recognized" in Arizona. *Id.; see also Wagenseller v. Scottsdale Mem'l Hosp.,* 147 Ariz. 370, 386–88, 710 P.2d 1025, 1041–43 (1985), *superceded by* A.R.S. §§ 23–1501 to –1502 (Supp.2003). In briefly recounting the history and application of the tort, the Arizona Supreme Court noted:

In *Meason v. Ralston Purina Co.,* 56 Ariz. 291, 107 P.2d 224 (1940), we recognized a cause of action for wrongful interference with a sales contract. We have since allowed a cause of action for interference with a lease agreement, for inducing breach of a restrictive covenant, for interference with an agency contract, and for interference with business relationships.

*Wagenseller,* 147 Ariz. at 386, 710 P.2d at 1041 (citations omitted). Arizona's definition of this tort follows the case law generally and is consistent with the Restatement. *See* Restatement (Second) of Torts § 766 (1977). Other jurisdictions espouse a similar, but not identical test. *E.g., Gouin v. Gouin,* 249 F.Supp.2d 62, 75 (D.Mass.2003); *D 56, Inc. v. Berry's Inc.,* 955 F.Supp. 908, 912 (N.D.Ill. 1997) *Elgin v. Montgomery County Farm Bureau,* 549 So.2d 486, 488 (Ala.1989); *Waldroup v. Lindman,* 28 P.3d 293, 296 (Alaska

2001); *Thomas Phelps Found. v. Custom Ins. Co.,* 977 S.W.2d 33, 37 (Mo.App.1998). The elements of the tort neither exclude, nor explicitly refer to, lawyers acting in an adversarial context. We now turn to that issue.

### IV.

### Lawyers in an Adversarial Setting are Not Necessarily Immune from Actions for Intentional Interference with Contractual Relations

¶ 15 Roush contends that, as a matter of law, lawyers representing an adverse party [6] cannot be liable for intentional interference with contractual relations. We believe this argument casts too broad a net.

### A.

¶ 16 Arizona has recognized that this tort applies to an attorney *seeking* relief from an insurer that has allegedly interfered with the attorney's relationship with his client. *Plattner v. State Farm Mut. Ins. Co.,* 168 Ariz. 311, 314, 812 P.2d 1129, 1134 (App.1991). In that case, the plaintiff-attorney represented one of State Farm's insureds in a direct bad faith action against State Farm. *Id.* at 312–13, 812 P.2d at 1130–31. In the course of that litigation, there was a dispute over whether an amount directed to the insured was (1) intended to settle the bad faith suit, or (2) left the bad faith claim in place and was merely a "no strings attached" payment of what was owed under the policy. *Id.* at 313, 812 P.2d at 1131. Because Plattner had conversations with a State Farm claims representative on this issue, Plattner became a material witness and was forced to withdraw. *Id.* at 314, 812 P.2d at 1132. The underlying bad faith case was settled and Plattner, rather than receiving a full fee, received only 50% of the fee. *Id.*

¶ 17 After the underlying bad faith suit was filed, Plattner filed an action for intentional interference with contractual relations against State Farm. *Id.* He alleged that

State Farm, acting through Hunsaker [State Farm's counsel] and Swiebel [State

---

6. We point out, but do not base our decision on, the fact that Roush and Botma are not traditional "adverse" parties. This is because of the

features of *Damron/Morris* agreements discussed subsequently.

Farm's claims representative] *contrived* in December 1995 *to misrepresent* State Farm's intent concerning the settlement, (the basis for the second bad faith claim), knowing that State Farm could dispute the substance of the conversation later, and thereby force Plattner to become a witness and withdraw from the case.

*Id.* (emphasis added).

¶ 18 The similarities between the *Plattner* decision and this matter are striking. Attorney Plattner alleged that the insurer, through counsel and its claims representative, had "contrived ... to misrepresent State Farm's intent" in order to interfere with the relationship between Plattner and his client. The only difference here is the identity of the tortfeasor. The insurer alleges that plaintiff's counsel misrepresented plaintiff's intent to settle in order to improperly interfere with the relationship between insurer and insured. This case is the flip side of *Plattner*. It would seem inconsistent and contradictory to have a controlling legal principle that provided, *as a matter of law*, that an *insurer's* conduct could be actionable under this tort for improperly interfering with a lawyer's relationship with his or her client, but that a *lawyer's* conduct could not similarly be actionable if that lawyer improperly interferes with the relationship between the insurer and insured.

### B.

¶ 19 Roush, however, directs us to *Drummond v. Stahl,* 127 Ariz. 122, 125–26, 618 P.2d 616, 619–20 (App.1980) and related cases that invoke the privilege afforded counsel in making defamatory statements during the course of judicial proceedings. *Green Acres Trust v. London,* 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984); *Lewis v. Swenson,* 126 Ariz. 561, 564, 617 P.2d 69, 74 (App.1980).

¶ 20 In *Drummond,* the plaintiff-attorney sought relief against opposing counsel under this same tort. Roush argues that *Drummond* indicates that our law does not permit an intentional interference with contractual relations claim against an opposing counsel. We disagree. The facts in *Drummond* are significantly different from those here. In *Drummond,* the basis for plaintiff's claim

was the allegation that opposing counsel had filed both a motion to disqualify and a complaint with the State Bar that forced Drummond to withdraw from the case. 127 Ariz. at 125–26, 618 P.2d at 619–20. We held that "[d]efamatory statements contained in pleadings are absolutely privileged if they are connected with or have any bearing on or are related to the subject of inquiry." *Id.* at 125, 618 P.2d at 619. As to the Bar complaint, the court found that public policy grounds required "an absolute privilege to anyone who files a complaint with the State Bar alleging unethical conduct by an attorney." *Id.* at 126, 618 P.2d at 620. The court found that "public policy demands the free reporting of unethical conduct if we are to continue to enjoy the privilege of a self-regulating profession." *Id.*

¶ 21 Therefore, the *Drummond* case was limited to defamatory statements in pleadings and formal Bar complaints. It rejected the claim of intentional interference with contractual relations in that context. We are not persuaded, particularly in view of *Plattner,* that *Drummond* requires us to reject a claim of intentional interference with contractual relations under different factual scenarios, such as that here. In this case the alleged misconduct included setting up a "sham" bad faith case by making a policy limits offer and then withdrawing that offer before the insurer could complete the steps required to have the court approve it. This is clearly a different factual setting than *Drummond.*

### C.

¶ 22 Roush also contends that our cases do not presently allow a claim for intentional interference with contractual relations and our case law should not be so expanded. Roush argues that claims for fraud and intentional infliction of emotional distress against opposing counsel have not been allowed, citing *Linder v. Brown & Herrick,* 189 Ariz. 398, 943 P.2d 758 (App.1997). Roush also relies on *Lewis,* 126 Ariz. 561, 617 P.2d 69, holding that an adverse party may not bring a negligence action against an opposing lawyer. Each of those cases contains a

statement, though not necessary to either decision's holding, that actions against adverse attorneys "must be pleaded as an action for malicious prosecution." *Id.* at 564, 617 P.2d at 72 (quoting *Norton v. Hines,* 49 Cal.App.3d 917, 123 Cal.Rptr. 237, 240 (App. 1975)).

¶ 23 In *Giles v. Hill Lewis Marce,* 195 Ariz. 358, 360–61, ¶¶ 5, 6, 988 P.2d 143, 145–46 (App.1999), we examined both *Lewis* and *Lindner* and rejected the arguments that Roush makes here. In neither case was the statement necessary to the court's conclusion. *Id.* Just as *Giles* distinguished those cases in the context of allowing an action for wrongful institution of civil proceedings against an adverse attorney, we likewise do not find the statements persuasive in determining whether adverse attorneys can be liable for intentional interference with contractual relations.

### D.

¶ 24 Roush also contends that even if the foregoing cases do not preclude a claim of intentional interference with contractual relations, the absolute privilege for defamatory statements in the course of judicial proceedings should. In *Green Acres Trust,* the Arizona Supreme Court rejected a defendant-attorney's argument in a defamation action that his comments to the press were protected by this privilege. 141 Ariz. at 614, 688 P.2d at 622. In doing so, the court gave guidance as to the scope and application of the privilege.

¶ 25 Without attempting to define the limits of that privilege beyond the circumstances here, we note that the privilege is an "absolute privilege *to defame* in connection with a judicial proceeding." *Id.* at 613, 688 P.2d at 621 (emphasis added). The court noted with approval the definition of the privilege to defame from the Restatement:

> An attorney at law is absolutely privileged *to publish defamatory matter* concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, *if it has some relation to the proceeding.*

*Id.* (quoting Restatement (Second) of Torts § 586 (1977)) (emphasis added). As the court also noted, "We agree that 'special emphasis must be laid on the requirement that it [statement] be made in furtherance of the litigation and to promote the interest of justice.' Without that nexus, the defamation only serves to injure reputation." *Id.* at 613–14, 688 P.2d at 621–22 (quoting *Bradley v. Hartford Accident & Indem. Co.,* 30 Cal. App.3d 818, 106 Cal.Rptr. 718, 723 (1973)) (alteration in original). "[T]he defamatory publication must relate to, bear on or be connected with the proceeding." *Id.* at 613, 688 P.2d at 621. The court also noted that "[t]he privilege protects judges, parties, lawyers, witnesses and jurors. The defense is absolute in that *the speaker's motive, purpose or reasonableness in uttering a false statement* do not affect the defense." *Id.* at 613, 699 P.2d at 621. Thus, we learn that (a) the heart of the privilege is *defamation* and (b) the defamatory statement must be *reasonably connected* to the proceeding itself.

¶ 26 We have no difficulty in determining that correspondence with an insurer for purposes of settlement is reasonably connected to the proceeding, whether the insurer is a party to the proceeding or not, to be eligible for this privilege. We reject Safeway's argument on this theory.

¶ 27 By indicating that the *heart* of the privilege is defamation, we expressly decline and do not endorse a narrow scope of the privilege that limits its application to defamatory statements only. We need not, and do not, make this ruling. On the other hand, read too broadly, failure to acknowledge the source of the privilege as being derived from defamation could stretch the privilege beyond its appropriate confines. For example, it is one thing to provide the privilege to a *statement,* the sole consequence of which can be a defamation action. It is another to extend the privilege to conduct. Taking an extreme example, obtaining relevant documents is reasonably related to a judicial proceeding. However, if a lawyer breaks into an opposing party's home to obtain them, the privilege would not protect him from a trespass charge. *See Southern Union Co. v.*

*Southwest Gas Corp.,* 165 F.Supp.2d 1010, 1016 (D.Ariz.2001) ("[A]n attorney may be liable to a third person for acts arising out of the attorney's representation of a client, if the attorney is guilty of 'fraud, collusion, or a malicious or [intentional] tortious act.' ") (quoting *Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co.,* 931 S.W.2d 166, 177 (Mo.App. 1996)) (citations omitted and alteration in original).

¶ 28 Here, the gist of the intentional interference with contract claim (when viewed from Safeway's perspective) is that Roush *acted* outside the accepted boundaries for *Damron/Morris* agreements with the intent to "manufacture" a bad faith claim. The settlement offer made by Roush was *withdrawn* by Roush, as opposed to being rejected by Safeway. Also, as we discuss later, because it was withdrawn for a stated purpose that did not permit a *Damron/Morris* agreement furthers Safeway's claim. Additionally, as the federal district court determined, the parties were apparently working together to conclude the settlement when Roush withdrew it. Thus, the core of the matter is that Roush *made and then withdrew* the settlement offer, *refused to proceed* with the partly concluded settlement proceedings,[7] and then *entered into a Damron/Morris* agreement outside established legal boundaries. It is this *conduct* (though often effectuated by words) that is the core of the scheme that Safeway claims as a basis for its intentional tort claim. Thus, it is action, not words, that form the basis of Safeway's claim.

¶ 29 Viewed in this context, Safeway's claim is much closer to a claim for wrongful institution of civil proceedings than a defamation action. In the former setting an adverse lawyer may be sued, *see, e.g., Carroll v. Kalar,* 112 Ariz. 595, 545 P.2d 411 (1976); in the latter setting an adverse lawyer may not be sued, see, *e.g., Green Acres Trust,* 141 Ariz. at 613, 688 P.2d at 621. To institute a WICP proceeding against an adverse attorney, a party must prove that the lawyer (1) instituted a civil action which was (2) motivated by malice, (3) begun without probable cause, (4) terminated in plaintiff's favor, and

(5) damaged plaintiff. *Carroll,* 112 Ariz. at 596, 545 P.2d at 412. If we were to stretch the "absolute privilege to defame" from *Green Acres Trust,* in the manner that Roush desires, that privilege would come in direct conflict with our extensive Arizona jurisprudence that allows for such suits against opposing counsel when the elements are met. *Carroll,* 112 Ariz. at 596, 545 P.2d at 412; *Lane v. Terry H. Pillinger, P.C.,* 189 Ariz. 152, 154, 939 P.2d 430, 432 (App.1997); *Smith v. Lucia,* 173 Ariz. 290, 294, 842 P.2d 1303, 1307 (App.1992).

¶ 30 In particular, a claim for an intentional interference with contractual relations requires *conduct* as in a WICP claim. As part of establishing such a claim, the plaintiff must show that defendant (be that person a lawyer or lay person) intentionally interfered with the contractual relationship and "that the defendant acted *improperly.*" *Wells Fargo,* 201 Ariz. at 493, ¶ 74, 38 P.3d at 31 (emphasis added). We recognize that in some instances that conduct may be, as here, largely effected through words, but it is the conduct underlying the words that is potentially actionable. Thus, we do not accept the proposition that the privilege that attaches to judicial proceedings precludes the possibility that adverse attorneys can be sued for the intentional tort of interference with contractual relations even when the complained of conduct is connected to the judicial proceeding.

¶ 31 Having rejected the proposition that an adverse attorney may not, as a matter of law, be sued for the tort of intentional interference with contractual relations, we now turn to the question of whether the right to a *Damron/Morris* agreement precludes such a claim here.

### V.

### *The Principles Underlying Damron/Morris Agreements Do Not License Improper Interference with the Insured/Insurer Relationship*

#### A.

¶ 32 The thrust of Roush's argument is that to allow a lawyer to be sued for inten-

---

7. To effectuate the settlement, Safeway had to obtain releases of other individuals who were injured in the same accident and who had claims against the same policy. The parties also needed to obtain the approval of a Wyoming court as to the settlement due to a conservatorship.

tional interference with contractual relations, while that lawyer is attempting to implement a Damron/Morris agreement, essentially vitiates the right to enter into such an agreement and is "contrary to the well established line of cases upholding and approving such agreements."

¶ 33 We agree with Roush that the ability of insureds, through counsel, to enter into *Damron/Morris* agreements is a substantial and important right. Our holding today does not interfere with, and does not modify, the case law that provides insureds (through counsel or otherwise) the very important ability to enter into *Damron/Morris* agreements. If allowing a claim for intentional interference with contractual relations had that effect, we would agree with Roush that the principles from *Damron/Morris* should prevail. However, as we discuss below, we find nothing in those cases permitting *Damron/Morris* agreements which would protect those lawyers who cross the line and enter into *Damron/Morris* agreements *outside* the permitted parameters. We turn now to the cases that establish the parameters for *Damron/Morris* agreements.

### B.

■ ¶ 34 There is no such thing as an unconditional, absolute right to a *Damron/Morris* agreement. Before such an agreement can be entered, an insurer must have breached its duty to the insured, *e.g.*, *State Farm Mut. Auto. Ins. Co. v. Peaton*, 168 Ariz. 184, 192, 812 P.2d 1002, 1010 (App. 1990) ("[F]or an insured to be free to sign a *Damron* agreement without simultaneously voiding coverage, the insurer must have done something in violation of its contract which placed the insured in jeopardy."), or issued a reservation of rights. *Morris*, 154 Ariz. at 119, 741 P.2d at 252 ("[A]n insured being defended under a reservation of rights may enter into a *Damron* agreement without breaching the cooperation clause."). These limitations are necessary because an insured has a duty to cooperate with the insurer. *Id.* at 117, 741 P.2d at 250 ("When an insurer performs its contractual obligations to defend, the policy requires the insured to cooperate with the insurer."). As *Morris* states,

"The insured ... may not settle with the claimant without breaching the cooperation clause unless the insurer first breaches one of its contractual duties." *Id.* Thus, it is only after the breach of a duty on the part of the insurer, or a reservation of rights, that an insured is freed from this duty to cooperate and allowed to negotiate a *Damron/Morris* agreement with a third-party tort claimant.

¶ 35 In such circumstances, an insured may seek to negotiate with a tort claimant in order to avoid "the sharp thrust of personal liability." *Id.* at 118, 741 P.2d at 251 (citing *Arizona Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987); *Damron*, 105 Ariz. at 153, 460 P.2d at 999); *Himes*, 205 Ariz. at 37, ¶ 15, 66 P.3d at 80. Our supreme court in summarizing these principles has stated:

> As a general matter, insurance carriers owe their insureds three duties, two express and one implied. These are the duties to indemnify, the duty to defend, and the duty to treat settlement proposals with equal consideration. Any breach, actual or anticipatory, of these duties deprives the insured of the security that he has purchased because the breach leaves him exposed to personal judgment and damage which may not be covered or may exceed the policy limits. Accordingly, *when such a breach occurs, the insured is generally held to be freed from his obligations under the cooperation clause.*

*Helme*, 153 Ariz. at 137, 735 P.2d at 459 (citations omitted and emphasis added).

### C.

■ ¶ 36 Dealing first with the situation involving a reservation of rights, it is typically a simple matter to know when an insurer has reserved its rights—a written letter to that effect will be sent to the insured. In the case before us, there is no reservation of rights letter, nor any issue in that regard. Yet this situation directly addresses Roush's argument that the principles underlying *Damron/Morris* agreements prevent the imposition of tort liability for intentional interference with contractual relations. If an insurer has not issued a reservation of rights, and has breached no other duty to the in-

sured, it seems quite plain to us that an insured has no right to enter into a *Damron/Morris* agreement. Merely having insufficient coverage for a potential liability does not permit insureds or their counsel to negotiate *Damron/Morris* agreements contrary to their duties under the cooperation clause. We can conceive of no reason why the principles permitting *Damron/Morris* agreements would immunize a lawyer who engages in such conduct from a suit for intentional interference with contractual relations.

¶ 37 Another typically clear-cut situation that permits the negotiation of a *Damron/Morris* agreement occurs when the insurer refuses to defend. *Damron,* 105 Ariz. at 153–54, 460 P.2d at 999–1000. If no defense is provided, insured and counsel may negotiate a *Damron/Morris* agreement. *Id.* This scenario likewise makes the point that when a defense is provided (as here) and no other duty is breached, the principles underlying *Damron/Morris* agreements do not protect the lawyer who ignores those principles and negotiates a *Damron/Morris* agreement.

¶ 38 Yet a third circumstance in which an insured may enter into a *Damron/Morris* agreement is when the insurer has failed to give equal consideration to the insured's interest when considering a settlement offer. *Peaton,* 168 Ariz. at 195, 812 P.2d at 1013 (quoting *Helme,* 153 Ariz. at 137, 735 P.2d at 459) ("As a general matter, insurance carriers owe their insureds ... the duty to treat settlement proposals with equal consideration.... [W]hen such a breach [of this duty] occurs, the insured is generally held to be freed from his obligations under the cooperation clause."); *see, e.g., Miel v. State Farm Mut. Auto. Ins. Co.,* 185 Ariz. 104, 107, 109–10, 912 P.2d 1333, 1336, 1338–39 (App.1995) (accepting that *Damron* agreement was valid, although remanding case because jury received incomplete instructions regarding bad faith claim). This is the situation claimed to be present here. We readily acknowledge that the authority for insureds and their counsel to enter into agreements is not nearly so sharply defined in this circumstance as in the prior two. There is neither a reservation of rights letter, nor a failure to employ counsel for the insured, to use as a determining factor. An insurer may reject a settlement offer, but its rejection is only a breach of the duty if in so doing it failed to give "equal consideration" to the insured's interests. *Id.* There is no bright line to signal an insured that a breach has occurred.

¶ 39 Roush's position is essentially that under no circumstances could a lawyer in this setting overstep his or her bounds. In our view, this is clearly wrong. For instance, suppose reasonable people agreed that a case had a value of between $10,000 to $25,000, and the insured had a policy with limits of $300,000. We doubt there are many who would urge that the failure of an insurer to accept a policy limits settlement offer allows the claimant to pursue a *Damron/Morris* agreement. Similarly, if counsel pursued a *Damron/Morris* agreement in that setting, we do not believe that the principles underlying *Damron/Morris* would protect that counsel from his or her conduct. Thus, even though the line may be more difficult to draw, the principle is still sound: Counsel who negotiate *Damron/Morris* agreements outside the permitted parameters do so at their peril. They are not protected, as a matter of legal principle, from liability that would otherwise flow to them.

¶ 40 In short, we reject Roush's position that the actions of counsel who have allegedly crossed the permissible line in pursuing a *Damron/Morris* agreement are protected by the cases that establish that important right. The issue is whether facts support the allegation that the line has been crossed. We now turn to that issue: whether Roush's conduct here, when viewed in a light most favorable to Safeway, creates a question of material fact on the issue of intentional interference with contractual relations.

## VI.

### Whether Roush's Conduct, When Viewed in a Light Most Favorable to Safeway, Creates a Jury Question on the Issue of Intentional Interference with Contractual Relations.

#### A.

¶ 41 As we noted earlier, the tort of intentional interference with contractual relations

has five elements: "(1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Wells Fargo,* 201 Ariz. at 493, ¶ 74, 38 P.3d at 31. It is only the fifth element, whether Roush "acted improperly," that is at issue here.

¶ 42 The requirement that the interference be *improper* is indispensable. *Id.; Wagenseller,* 147 Ariz. at 387–88, 710 P.2d at 1042–43. Further, the act of interfering does not, standing alone, mean that the defendant has "acted improperly."

> We find nothing inherently wrongful in "interference" itself. If the interferer is to be held liable for committing a wrong, his *liability must be based on more than the act of interference alone.* Thus, *there is ordinarily no liability absent a showing that defendant's actions were improper as to motive or means.*

*Wagenseller,* 147 Ariz. at 388, 710 P.2d at 1043 (emphasis added).

¶ 43 In determining whether a defendant has "acted improperly" for purposes of this tort, Arizona, like other jurisdictions, applies a seven factor analysis that considers: a) the nature of the actor's conduct,(b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Wells Fargo,* 201 Ariz. at 494, ¶ 81, 38 P.3d at 32 (citations omitted). As *Wagenseller* noted:

> The factors enumerated in § 767 of the Restatement [ (Second) of Torts (1979) ] will form the basis for consideration of this element of the tort. If the plaintiff is unable to show the impropriety of the defendant's conduct based on an examination of these factors, the conduct is not tortious.

*Wagenseller,* 147 Ariz. at 388, 710 P.2d at 1043.

¶ 44 Not all factors need be weighed equally. "Factors deserving the most weight are the nature of the actor's conduct and the actor's motive." *Wells Fargo,* 201 Ariz. at 495, ¶ 81, 38 P.3d at 33; *see also G.M. Ambulance & Med. Supply Co. v. Canyon State Ambulance, Inc.,* 153 Ariz. 549, 551, 739 P.2d 203, 205 (App.1987). Our case law also provides that "[c]onduct specifically in violation of statutory provisions or contrary to public policy may for that reason make an interference improper." *Wells Fargo,* 201 Ariz. at 495, ¶ 82, 38 P.3d at 33.

¶ 45 Safeway also cites, in keeping with these principles, to a prior reported case involving aspects of this same litigation. *Botma v. Huser,* 202 Ariz. 14, 39 P.3d 538 (App.2002) (*"Botma II"*). In that case, Roush had filed suit against Botma's lawyers based on the assignment of Botma's potential claim against his insurer-assigned counsel. In rejecting that claim, we stated that any other result would "give too much substance to the cynical belief of some that 'lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth.'" *Id.* at 18, ¶ 17, 39 P.3d at 542 (quoting *Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 318 (Tex. App.1994)).

**B.**

¶ 46 We now turn to the facts applicable here, but in doing so, we stress again that this is a de novo review of an entry of summary judgment. This is not a case where a judge or jury has determined and resolved conflicting facts. We have no difficulty in determining that if (as Roush contends) the *Damron/Morris* agreement was made within the permissible boundaries, Roush's conduct could not, as a matter of law, be actionable under this tort. We are not, however, in that procedural posture. Our charge is to determine whether there are facts present to support Safeway's position that the interference in this particular case was outside the permissible boundaries of *Damron/Morris* and therefore improper. If the factual inferences support Safeway's

position that Roush intentionally stepped outside the permissible boundaries of *Damron/Morris* agreements in attempting to create a bad faith claim, then we believe there is a factual basis to find that Roush has "acted improperly" for purposes of this tort. We now assess the evidence Safeway offers.

¶ 47 Peter Guerrero ("Guerrero"), on behalf of Roush and Himes, sent an October 23, 1995 demand letter to Safeway offering settlement in return for (1) the $15,000 per person policy limits, (2) a certified copy of the insurance policy and (3) the opportunity to take a sworn statement from Botma.[8] *Botma I*, slip op. at 7, 10. Four days later, Safeway responded that it was in the process of attempting to effectuate a global settlement of all claimants under the policy which would entail offering the policy limits. *Id.* at 10–11.

¶ 48 On December 18, 1995, Safeway wrote to all claimants (including Himes through Guerrero) that "I am pleased to write to you *extending settlements* to your respective clients' injuries" from the automobile accident. *Id.* at 11–12 (emphasis added). The letter set forth a proposal that gave Himes the maximum per person amount available under the policy ($15,000), which is the amount Himes had requested. *Id.* at 12. The letter did not refer to the sworn statement by Botma (with whom Safeway had been unable to make contact). *Id.* at 11 n. 4. Nor did it refer to the request for a certified copy of the declarations page of the policy. *Id.* The letter concluded by stating, "After each of you has had time to review my calculations of settlement amounts, please contact me to confirm your agreement with the settlement. I will then offer the appropriate drafts, and releases." *Id.* at 12. On

January 18, 1996, Guerrero wrote back to Safeway and said, "You can proceed with settlement of this claim as previously suggested." *Id.* at 13.

¶ 49 There were delays in effecting the settlement due to the need to obtain the release of a medical lien and the approval of a Wyoming court handling the conservatorship for Holly Castano. However, forms of releases were exchanged between Roush and Safeway. They provided for a complete release of all claims against Botma and Safeway in exchange for the $15,000 policy limits. The release did not mention the requirements in the original settlement offer of a sworn statement from Botma and a certified copy of the declarations page of the policy. As described by the federal district court, "It seems clear at this point [June 4, 1996] in the negotiations that the only prerequisites to settlement of the claim were that the Wyoming court order and release be provided to Safeway in exchange for the settlement check." *Id.* at 14.

¶ 50 Notwithstanding this view of the state of the record, that only administrative tasks remained to be done to conclude this matter, Roush withdrew from what Safeway thought was a settlement. No mention was made of the failure on the part of Safeway to give equal consideration to the settlement. Further, no mention was made of Safeway's failure to meet the prior terms relating to a sworn statement or a declarations page. Rather, Roush, through Guerrero, said they now wanted to sue the automobile manufacturer and did not want Botma unrepresented as an "empty chair." As Guerrero stated, "I am writing this letter to let you know that I have decided not to settle Holly Castano's claim against your insured. We will be filing a lawsuit against General Motors on a prod-

---

8. The pertinent portion of the October 23, 1995 letter is as follows:

> Ms. Castano's claim is certainly worth in the several million dollar range. We are woefully aware of the limits of the Safeway policy and that there are other claimants against the policy....
>
> We would like to settle the liability claim at this time in the following bases:
> 1. Safeway pays its per person policy limits to "Patricia Himes" [As conservator for Castano].
> 2. Safeway provides to us a certified copy of the declarations page of the Juarez policy; and
> 3. Safeway makes Steven Duane Botma available to us in order to take a sworn statement from him.
>
> Please call me within the next two weeks to discuss this....

*Botma I*, slip op. at 10 (alterations in original).

uct liability theory for the collapse of the seatback and the driver of your insured vehicle." *Id.* at 14. The federal district court described the record further, "Guerrero later gave deposition testimony that he had spoken with Cronan [of Safeway] and advised him that he was considering withdrawing the $15,000 policy limit demand *because of a concern over an 'empty chair' defense in his products liability suit against GM.*" *Id.* at 14–15 (emphasis added).

¶ 51 The upshot of these facts is that a reasonable juror could conclude, on a preponderance of the evidence, that Roush had no basis to conclude that Safeway had rejected any settlement proposal by failing to give equal consideration to Botma's interests. The settlement offer was put forth by Roush and withdrawn by Roush. Rather than rejecting the offer, the record very clearly supports the inference that Safeway believed it had settled the case.[9] One clear conclusion that a jury may draw from these facts is that Roush advanced, and then withdrew, a settlement offer for the purpose of allowing Roush to pursue a *Damron/Morris* agreement and attempt to generate a recovery (including fees) substantially beyond the $15,000 policy limits. We emphasize that the stated purpose of the withdrawal of the settlement by Guerrero himself, on behalf of Roush, was to avoid an "empty chair." This is *not* a permissible basis for a *Damron/Morris* agreement. *See supra* ¶¶ 36–39. Pursuing a *Damron/Morris* agreement on these grounds is conduct, which if accepted by the jury, is clearly outside the permissible scope of such agreements. *Id.* Roush's alleged conduct is conduct that may be considered "acting improperly" based on the factors set forth above. *See supra* ¶¶ 43–44.

### C.

¶ 52 Roush attempts to excuse their use of *Damron/Morris* by arguing on appeal that

"Roush's ethical and legal duty and motivation were *simply to maximize recovery.*" (Emphasis added.) While certainly that is *part* of Roush's duty, an unbounded pursuit of "maximiz[ing] recovery" has *never* been countenanced by our legal or ethical rules. *See Giles,* 195 Ariz. at 362, 988 P.2d at 146 ("[A]n attorney's duty to vigorously represent a client is limited by rules of law and principles of ethics and professionalism . . . .").[10]

¶ 53 Roush also attempts to excuse their conduct by arguing that when Botma chose to enter the *Damron/Morris* agreement, he was represented by counsel. Further, Roush argues that it was Botma's counsel who sought Roush out and worked with Roush in concluding the agreement. First, our cases make clear that an insured who is faced with a threat of personal exposure would be "quite willing to agree to anything as long as plaintiff promised them full immunity." *Morris,* 154 Ariz. at 120, 741 P.2d at 253 (quoting *Miller v. Shugart,* 316 N.W.2d 729, 735 (Minn.1982)); *Himes,* 205 Ariz. at 38, ¶ 22, 66 P.3d at 81 (quoting *Miller,* 316 N.W.2d at 735). Whether an insured is represented by counsel does not change that motivation. Second, other facts show that *Roush* initially proposed the *Damron/Morris* agreement, but prior counsel for Botma advised that it be rejected. Whether Roush initially proposed the agreement or not is, at a minimum, a question for the jury. Regardless, the fact that counsel for Botma went along with it (or even proposed it) does not change Roush's duty to stay within the permitted boundaries for a *Damron/Morris* agreement and not interfere with the contractual relationship between the insured and the insurer outside those boundaries.

¶ 54 Roush additionally argues that a stipulation made by Safeway, when opposing the reasonableness of the $12 million *Damron/Morris* agreement, means that Safeway's

---

9. That a prior jury found the settlement had not in fact been completed, *supra* at ¶ 5, is not inconsistent with a subsequent jury's potential finding that Safeway acted in good faith to bring that settlement about. This is precisely what the federal district court determined. *Supra* at ¶ 8.

10. While not the basis for our ruling, we note that the recent amendments to the Arizona Rules of Professional Conduct are consistent with this case law. The amendment to the preamble removed the term "zealous" and replaced it with the phrase that "lawyers should conduct themselves *honorably.*" Arizona Rules of the Supreme Court 42, Preamble (emphasis added).

factual theory must be rejected. The stipulation was in a separate proceeding on reasonableness of the amount in the *Damron/Morris* agreement. The stipulation was that "there is *no fraud* going to be alleged *as part of this case.*" This argument fails because this is not a fraud action, but a claim for intentional interference with contractual relations in which the contested element is that Roush "acted improperly." Even if relevant, the stipulation would only go to the weight of all the other facts when applied to the seven factors set forth above.

¶ 55 To conclude, we note that *Wells Fargo* made clear that the standard of proof for this intentional tort is one of preponderance of the evidence and that "[i]nferences arising from the evidence are sufficient to go to the jury under the preponderance standard." 201 Ariz. at 496, ¶ 86, 38 P.3d at 34. We hold that there are facts of record, as described herein, sufficient to allow this matter to proceed to a jury.

### Conclusion

¶ 56 For the foregoing reasons, the summary judgment of the trial court is reversed. The case is remanded to the trial court for proceedings consistent with this opinion.

CONCURRING: JON W. THOMPSON, Presiding Judge, and JEFFERSON L. LANKFORD, Judge.