545 P.2d 411

Daniel B. CARROLL, Appellant,

v.

George D. KALAR and Maggie Kalar, his wife, and George W. Oglesby and Yolanda G. Oglesby, his wife, Appellees.

No. 11714.

Supreme Court of Arizona,
In Division.

Jan. 19, 1976.

Paul W. Holloway, Phoenix, for appellant.

George W. Oglesby in pro. per.

STRUCKMEYER, Vice Chief Justice.

Appellant, Daniel B. Carroll, brought this action against George D. Kalar and his attorney, George Oglesby, alleging that each was liable for malicious prosecution of a suit in malpractice brought against him. The Superior Court granted the appellees' motion for summary judgment and Carroll has appealed. We took jurisdiction pursuant to Rule 47(e) 5, Rules of the Supreme Court. Affirmed.

On October 24, 1969, George Kalar, by George Oglesby, his attorney, filed a medical malpractice suit against Drs. M. S. MacCollum, John Ricker, and Daniel B. Carroll. It was alleged that they were negligent in recommending surgery for Kalar's wrist—a synovectomy and/or fusion of the wrist bones. The trial court granted a summary judgment favorable to Carroll. He then filed suit against Kalar and Oglesby, alleging that the malpractice action was brought ` without ∙reasonable cause and∙with knowledge that the allegations of the complaint were untrue and unjustified and that the suit was brought with malice to vex and harass him. Appellees moved for summary judgment for the reason that they had probable cause to maintain a suit for malpractice. Their motion was granted and from the judgment based thereon Carroll has appealed.

▮ The essential elements which must be shown to establish a malicious prosecution action are: (1) the institution of a proceeding, (2) actuated by malice, (3) without probable cause by the defendant in this action, (4) which terminated in plaintiff's favor, (5) and caused him dam-ages. The failure to establish a lack of probable cause is a complete defense to an action for malicious prosecution. *Slade v. City of Phoenix,* 112 Ariz. 298, 541 P.2d 550 (1975); *McClinton v. Rice,* 76 Ariz. 358, 265 P.2d 425 (1953). Whether the facts in a particular case are sufficient to constitute probable cause is a question of law to be determined by a reasonable man test. "[U]pon the appearances presented ∙o the defendant, would a reasonably prudent man have instituted or continued the proceeding?" *McClinton v. Rice,* supra, 76 Ariz. at 367, 265 P.2d at 431.

Whether probable cause existed for Kalar to file suit against Carroll for medical malpractice requires a more detailed examination of the facts.

▮ Kalar, while in the course of his employment, sustained an injury to his right wrist on November 8, 1966. The injury was diagnosed as synovitis by Kalar's personal physician. Synovitis is an inflammation of the synovial membrane which lines the various joint cavities in the wrist. Treatment was not effective, and eventually Kalar consulted Dr. MacCollum, a bone specialist. Dr. MacCollum treated the wrist as a possible fracture of the navicular bone. After several weeks, when no improvement was shown, Kalar was referred to the "Hand Board" of the Industrial Commission of Arizona. This board consists of physicians who specialize in the treatment of the hand, wrist, and arm, and who advise the Commission as to treatment and determine for the Commission the percent of disability from an injury. The board which convened to consider Kalar's case was composed of Drs. MacCollum, Ricker and appellant Carroll. It examined Kalar and reviewed X-rays that had been taken some five months earlier and concluded that Kalar had degenerative joint disease and suffered from synovitis. The board recommended surgery and, depending upon the findings from such surgery, the removal of the synovium and/or a fusion of the wrist. Surgery was performed by Drs. MacCollum and Ricker.

Part of the navicular bone was removed and a piece of bone taken from Kalar's hip was fused with the lunate and radius bones. The fusion was unsuccessful and two further operations were required.

In May 1969, Kalar consulted Oglesby about representing him in a malpractice suit. Oglesby discussed the case with Dr. James F. Martin, a medical doctor practicing in Yuma, a member of the Tennessee Bar, and a member of the legal-medical committee of Yuma County, whose function was to render to attorneys opinions on the merits of potential medical malpractice actions. Dr. Martin examined Kalar's hospital chart, his emergency room records and X-rays, including those examined by the "Hand Board."

Dr. Martin's deposition was taken August 7, 1972. In it he testified:

"Q. [By Mr. Holloway, attorney for Carroll]: * * * the purpose of the visit was, it was for you to look at the x-rays and tell whether or not in your opinion there were fractures shown?

A. Fracture of the navicular or aseptic necrosis of that bone.

Q. And did you state to Mr. Oglesby that day whether or not you found any such fracture or whether or not the condition, aseptic necrosis, was present?

A. I told Mr. Oglesby that in my opinion I could see no fracture on any of the x-rays that were submitted not [sic] could I see any radiological evidence of aseptic necrosis.

Q. What is aseptic necrosis?

A. Aseptic necrosis is a condition that occurs in a bone when it loses its blood supply.

*      *      *      *      *      *

Q. Were you asked to state any opinion concerning the care and treatment given by [sic] Mr. Kalar by any of the attending physicians, Doctors Carroll, McCullum [sic] or Ricker and whether or not that treatment fell below any applicable standard of care?

*      *      *      *      *      *

A. * * * I felt that from the standards that I know in the practice of medicine that if it were a navicular fracture it was not treated properly.

Q. When you said, 'not treated properly,' in other words, a fusion was not indicated?

A. * * * Not only that, the radiologist recommended another x-ray study, diagnostic study which was not done and which could have determined whether or not probably the aseptic necrosis or a fracture actually did exist and those were tomographs or planographs, either one, of the wrist which could have determined bone density and whether or not there was a fracture. Now, the fact that that was not done—you see, six months ensued from the time that last series of x-rays were made at which time it was equivocal in the radiologist's mind whether or not a fracture existed. I think that is not acceptable medical practice that the man had six months worth of no treatment that the fracture, if it were there, which I didn't see, could have healed, you see, during that time without subjecting him to surgery and fusion of the wrist and some disability with that wrist and that's the basis of my opinion."

Dr. Martin further testified:

"Q. [By Mr. Oglesby, appellee]: Do you further recall my telling you that at the time the recommendation was made for surgery on Mr. Kalar's wrist in October of 1967 it had been some five months or so since x-rays had been made?

A. Yes.

Q. And do you recall my asking you whether under those circumstances they would have or it would be good medical practice to make a recommendation for surgery without having current x-rays?

*      *      *      *      *      *

A. My opinion was it was not good medical practice.

Q. Do you recall whether we discussed whether surgery should be recommended or performed prior to the time conservative therapy had been exhausted?

A. We discussed that in the light of whether or not there was actually a fracture of the navicular bone present.

Q. Yes.

A. And whether or not surgery should have been done, as it were, dependent upon whether or not the bone was actually fractured and aseptic necrosis ensuing and this we didn't see; or at least I didn't see on the x-rays; so, therefore, in my opinion the surgery was not—should not have been done.

Q. All right.

A. But there's another side to that in that if there was a fracture of the navicular and without aseptic necrosis then Mr. Kalar wasn't, in my opinion, properly treated for that ensuant six months before surgery. During that period of time then he could have had a union of that bone had there been a fracture * * *.

* * * * * *

Q. Well, doctor, do you recall that the hand board met and we discussed—

* * * * * *

A. It met in October and recommended that a fusion of the wrist, as I remember, be done.

* * * * * *

Q. Do you recall my questioning or asking you whether in your opinion x-rays should be obtained prior to the time any recommendation was made as to further treatment?

A. Yes. I remember that specifically. My opinion with reference particularly to the hand board is that in my own mind I couldn't see how a recommendation could be made by members of the hand board without having up-to-date x-rays on this man rather than x-rays five months earlier which were somewhat equivocal. I think they should

have had them before making a recommendation for that surgery.

Q. That's what you told me at the time?

A. Yes.

Q. Did you tell me that it was not good medical practice not to have them at the hand board?

A. I said it was poor practice not to have the x-rays."

The possibility that there might have been a union between the bones during the time lapse between the last X-rays and the board's recommendation and the possibility that conservative therapy could have been used, making surgery unnecessary in the opinion of Dr. Martin, together with his opinion that using X-rays five months old was not proper practice on the "Hand Board's" part, all demonstrate that, as a matter of law, appellees had probable cause to believe that a medical malpractice suit would properly lie against Carroll. We think a reasonable man faced with such facts could and probably would have brought suit.

Carroll's position is that while the question of probable cause for malicious prosecution of a civil suit is a question of law for the court, where there is a conflict in the facts they must be resolved by the jury, and such being the case here, the court was precluded from granting the appellees' motion for summary judgment.

■■■■ The law in this State is well developed and clear. In *Sarwark Motor Sales, Inc. v. Woolridge,* 88 Ariz. 173, 354 P.2d 34 (1960), the court pointed out that the precise roles played by the court and jury in resolving the question of law as to probable cause were set forth in *Murphy v. Russell,* 40 Ariz. 109, 9 P.2d 1020 (1932). Whether a given set of facts constitutes probable cause is always a question of law to be determined by the court. The only function of the jury is to determine what the actual facts are if the facts are conflicting. If from one set of facts the con-

clusion can be inferred that probable cause exists, and from another that it does not, it is for the jury to determine the true state of facts.

■ Carroll urges that the facts of this case are in conflict because he submitted the affidavits of two lawyers, members of the State Bar of Arizona, in opposition to appellees' motion for summary judgment. They expressed the opinion that the facts stated above were not sufficient to support probable cause in a malpractice suit. But this is not a conflict in the facts of the case which must be resolved by a jury. This is a conflict in personal opinions as to the significance of the facts. At best it is no more than a conflict between two attorneys and the trial judge as to whether the facts show probable cause. Since it is the responsibility of the trial judge to say whether the facts give rise to probable cause, the expressions of opinions by others are not relevant and are wholly immaterial to the decision in the case. The opinion of a lawyer on the question of probable cause is not admissible. Cf. *Baker v. Leight*, 91 Ariz. 112, 370 P.2d 268 (1962).

Carroll further argues that there is a conflict in the evidence because both Carroll and appellees rely on parts of Dr. Martin's deposition, taken on two different occasions. Dr. Martin testified on cross-examination that at no time did he tell appellees specifically that Carroll was negligent. However, Martin explained that this was because at the time of the consultation with appellees he had not known what part Carroll had in the incident. Dr. Martin's statement only indicates an ignorance of the identity of the persons on the "Hand Board" and not belief that Dr. Carroll was free from negligence. After Dr. Martin learned that Carroll was a member of the Industrial Commission "Hand Board" he did not change his opinion that the members of the "Hand Board" were not acting with due regard to proper medical practice.

■ Carroll urges that there was a jury question as to whether the appellees' "state of mind was such that they had probable cause of initiating the lawsuit." The state of mind to which Carroll refers is the honest or actual belief of Kalar and Oglesby that Carroll was guilty of malpractice. This state of mind has been held to ordinarily be a question for the jury. *See* the annotation, Malicious Prosecution-Probable Cause, 87 A.L.R.2d 183, 217 § 10 (1963), and cases cited. Carroll does not, however, point to any facts which would indicate that Kalar and Oglesby did not have an honest, actual belief in Carroll's guilt and from our reading of the record we can find no facts which would support the belief that there was a disputed question necessary to be resolved by a jury.

Carroll finally argues that there are genuine issues of material fact because in appellees' brief they concede that certain facts are subject to three interpretations. The interpretations which Carroll points to involve different medical opinions expressed by Drs. Martin, MacCollum and Carroll. Their divergent views as to the proper treatment for Kalar's injury do not in any manner relate to a want of probable cause. Rather, we think, they support the idea that a reasonable man in the place of appellees could file suit for malpractice.

For the foregoing reasons, the judgment of the Superior Court is affirmed.

CAMERON, C. J., and HAYS, J., concurring.