207 P.3d 666

**Simon D. CHALPIN, a single man, and Hi-Health Supermart Corporation, an Arizona corporation, Plaintiffs/Appellants,**

**v.**

**J. Kevin SNYDER, Esq., a California resident; Robins, Kaplan, Miller & Ciresi, LLP, a foreign corporation or partnership, Defendants/Appellees.**

No. 1 CA-CV 06-0371.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 21, 2008.

Reconsideration Denied Nov. 17, 2008.

Review Denied April 20, 2009.*

---

* Justice Bales did not participate in the determination of this matter.

Osborn Maledon, PA By Thomas L. Hudson and Surrano Law Offices By Charles J. Surrano, John N. Wilborn, Phoenix, Attorneys for Plaintiffs/Appellants.

Lewis and Roca, LLP By Keith Beauchamp, Lawrence A. Kasten, Amy Wilkins, Phoenix, Attorneys for Defendants/Appellees.

## OPINION

IRVINE, Judge.

¶ 1 Simon D. Chalpin ("Chalpin"), and Hi–Health Supermart Corporation ("Hi–Health") appeal from the trial court's dismissal of their aiding and abetting claim against J. Kevin Snyder ("Snyder") and his law firm, Robin, Kaplan, Miller & Ciresi, LLP ("Robin Kaplan"), pursuant to Arizona Rules of Civil Procedure 12(b)(6). Chalpin and Hi–Health also appeal from the trial court's entry of summary judgment in favor of Snyder and the law firm on their civil malicious prosecution claim pursuant to Arizona Rules of Civil Procedure 56. For the following reasons, we reverse.

## FACTS AND PROCEDURAL HISTORY

¶ 2 This appeal originated from an automobile accident and an attorney's conduct during subsequent insurance coverage litigation. Chalpin was Hi–Health's President and CEO. Chalpin's daughter, Debra, was involved in the company in several ways, including as a director. In March 1996, Hi–

Health requested automobile insurance coverage for Debra and her car from Reliance Insurance Company ("Reliance"). Hi–Health had a large commercial liability policy from Reliance that authorized Reliance to add personal vehicle coverage under the policy if the business had or obtained a property interest in the vehicle. Reliance would also collect an additional premium on personal vehicle coverage. At the time Hi–Health requested the coverage, Debra was attending law school in California and had a California driver's license.

¶ 3 Hi–Health's insurance broker, Willis Corroon, worked with Reliance in adding Debra to the policy. Willis Corroon provided Reliance a written Commercial Policy Change Request Form conveying the vehicle information, including that the car was "Garaged in Phoenix, AZ." Before providing coverage, Reliance did not ask Willis Corroon or Hi–Health any questions about the intended coverage. Reliance ultimately determined a quote for the coverage and accepted Hi–Health's premium payments. Accordingly, in March 1996, Reliance issued coverage for Debra's personal vehicle under Hi–Health's commercial policy.

¶ 4 In August 1996, after leaving a bar, Debra ran a red light in Los Angeles and ran into another car. Rhonda W., the driver of the other car, was severely injured and left in a vegetative state. Rhonda W.'s family sued Debra, who tendered the claim to Reliance. Reliance conducted an independent review of its coverage obligations and concluded that "[t]here are no coverage question[s] on this claim." Therefore, Richard H., Reliance's large claim specialist, assured Chalpin that there should be no issues concerning coverage. Reliance agreed to defend Debra and took significant efforts to settle the claim. Reliance also assured Debra "that there was coverage for her and her car" with the knowledge that she had used the vehicle for personal use, lived in California and had limited involvement with the business.

¶ 5 Reliance went to mediation with the injured driver's family and the family requested a five million dollar settlement. Reliance's representative had requested settlement authority of at least five million dollars, but Reliance would only authorize two million dollars. The Reliance representative who attended the mediation later acknowledged that had Reliance provided him the requested authority to settle for five million dollars, the claim would have settled during the mediation and the subsequent events would most likely not have occurred.

¶ 6 The case did not settle. Instead, Reliance prepared an internal document the day of the mediation noting that if the claim does not settle "Reliance will face a 'bad faith' claim on this case." The document also indicated that Reliance planned to hold a conference call to discuss "developing info[rmation] sufficient to disavow coverage for this incident." Subsequently, Reliance's directive for the claim was to "conduct an investigation with an eye towards disavowing coverage." To accomplish its directive, Reliance hired Snyder and Robin Kaplan to act as a fact finder. Reliance also involved its special investigation unit and requested a coverage opinion from a Phoenix law firm. Neither the special investigation unit nor the Phoenix law firm was able to help Reliance disavow its coverage. Indeed, the Phoenix law firm concluded that Arizona's doctrine of reasonable expectations would likely preclude Reliance from denying Debra coverage.

¶ 7 Snyder's initial opinion was consistent with the opinion of the Phoenix law firm. Snyder told Reliance that because it had accepted premium payments, "there would then be expectation of coverage for the vehicle and driver." Consequently, Reliance concluded that "there does not appear to be any help from the coverage opinions." Reliance also noted that "under the doctrine of expectation of coverage, it appears that we are on the hook for this claim."

¶ 8 Despite his initial opinion about coverage, Snyder later recommended that Reliance file a lawsuit against its insureds raising all coverage defenses as a means to put pressure on the injured driver's family to settle the case before coverage was rescinded or a determination was made that there was no coverage. Snyder made this suggestion with the intent to settle all claims before losing the merits of the coverage dispute.

¶ 9 Reliance apparently accepted Snyder's suggestion to file a lawsuit. Snyder sent Hi–Health a reservation of rights letter on Reliance's behalf notifying Hi–Health that it planned to "file an action for declaratory relief to determine whether there is coverage." The letter informed Hi–Health that "under California law, the policy is void and can be rescinded." The letter raised four issues of material fact that Reliance claimed were not disclosed at the time Hi–Health requested coverage for Debra and her car: (1) a prior DUI charge, (2) a policy cancellation by a prior automobile liability insurer, (3) Debra was not a Hi–Health employee, and (4) Debra was not using the car in connection with Hi–Health business. In May 1997, before filing any lawsuit, Reliance settled the claim with Rhonda W.'s family for $8.5 million. Still interested in recovering some or all of the settlement from Hi–Health, Reliance continued working with Snyder.

¶ 10 Meanwhile, on June 18, 1997, Debra and Hi–Health filed an action against Reliance seeking a ruling that coverage existed. Debra and Hi–Health filed a Second Amended Complaint on March 11, 1998, and the claims in it were the basis for the rest of the litigation. They alleged four counts; count one, seeking declaratory judgment that Debra and Hi–Health were not liable to Reliance for its payment of the settlement to Rhonda W.'s family, is the only relevant claim here.

¶ 11 Reliance responded on July 8, 1998, by filing a cross-claim that also sought relief against Chalpin personally, arguing that he was liable because Hi–Health was simply his corporate alter-ego.[1] Reliance alleged seven counts including: fraud, negligent misrepresentation, unjust enrichment, breach of contract and breach of an implied promise.

¶ 12 Fierce litigation ensued.[2] Chalpin and Hi–Health filed a motion for summary judgment on all of Reliance's claims, which the trial court granted in part on the claims of unjust enrichment, breach of implied promise and punitive damages. The trial court, however, allowed Reliance to take its claims of fraud and alter-ego to a jury. Ultimately, Reliance did not request a jury instruction for its alter-ego claim. The trial court also granted summary judgment in favor of Reliance on Chalpin and Hi–Health's waiver defense. The case then went to trial. The trial court instructed the jury on the theory of reasonable expectations coverage. In August 2002, the jury found in favor of Chalpin and Hi–Health, and rejected Reliance's remaining claims. Given that Chalpin and Hi–Health only sought declaratory relief, the trial judge awarded them $468,000 in attorneys' fees, $14,208.31 in costs, and revoked Snyder's ability to practice law in Arizona.

¶ 13 Despite success at trial, Chalpin wanted compensation for the severe emotional distress, anxiety and financial loss he suffered as a result of Snyder's plan. Additionally, Reliance never paid the attorneys' fee judgment because it declared bankruptcy. Consequently, on October 17, 2003, Chalpin and Hi–Health sued Snyder and Robin Kaplan (collectively from this point, "Snyder") for abuse of process, malicious prosecution, and aiding and abetting various torts.

¶ 14 Snyder moved to dismiss the aiding and abetting claim. Snyder argued that "Arizona law provides only two possible causes of action to those who sue adverse attorneys: malicious prosecution and abuse of process." The trial court granted Snyder's motion and dismissed the aiding and abetting claim for failing to state a claim. The trial court found that an attorney may not be liable for aiding and abetting the torts of bad faith, intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, and false light. The trial court also stated that a "review of Arizona case law reveals no specific case authorizing a lawsuit against an attorney whose representation of a client was alleged to be aiding and abetting; malicious prosecution and abuse of process." Furthermore, the trial court stated, "[t]he Courts have endorsed a public policy

---

1. Reliance previously filed a similar action in California Federal District Court, but it was dismissed for improper venue.

2. Debra died before the underlying litigation concluded.

holding lawyers accountable through abuse of process and malicious prosecution actions."

¶ 15 Snyder next moved for summary judgment on the remaining claims: malicious prosecution and abuse of process. Snyder argued that in previous litigation, Reliance's fraud claim survived both a motion for summary judgment and a motion for judgment as a matter of law. *See* Ariz.R.Civ.P. 50, 56. On April 17, 2006, the trial court granted Snyder's motion on the remaining claims. Regarding malicious prosecution, the trial court concluded that Chalpin and Hi–Health could not show a necessary element of malicious prosecution—an action was begun or maintained without probable cause. The trial court found probable cause based on the fact that the court in the underlying litigation "not only denied a motion for summary judgment, but permitted the case to go to the jury after hearing evidence and a Rule 50 motion." The trial court recognized that *Wolfinger v. Cheche,* 206 Ariz. 504, 80 P.3d 783 (App.2003) stated that denial of a motion for summary judgment was not conclusive as to probable cause, but found a Rule 50 ruling to be distinct. Making no distinction between Chalpin personally and Hi–Health, the trial court specifically stated:

> While the Court need not reach the question whether a denial of a [R]ule 50 motion would preclude the institution of a malicious prosecution action in any case, its review of the record in the underlying litigation leads it to conclude here that the granting of summary judgment on the issue of waiver and Judge Kaufman's denial of the [R]ule 50 motion on the fraud claim eliminate any genuine dispute of fact that could enable Plaintiffs [Chalpin and Hi–Health] to prove that Defendants [Snyder] fell short of the low standard prescribed by *Wolfinger* in maintaining their claims in the underlying case.

¶ 16 Chalpin and Hi–Health timely appealed the dismissal of their aiding and abetting

claim and the granting of summary judgment on their malicious prosecution claim.[3] We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).[4]

## STANDARD OF REVIEW

¶ 17 We review de novo a grant of summary judgment, viewing the evidence and reasonable inferences in the light most favorable to the party opposing summary judgment and construing any inferences in favor of that party. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons,* 201 Ariz. 474, 482, ¶ 13, 38 P.3d 12, 20 (2002). "Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Id.* at ¶ 14.

¶ 18 In reviewing a ruling granting a motion to dismiss, we assume the facts alleged in the complaint are true. *Fid. Sec. Life Ins. Co. v. State Dep't of Ins.,* 191 Ariz. 222, 224, ¶ 4, 954 P.2d 580, 582 (1998). We will affirm if we are "satisfied as a matter of law that plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof." *Id.*

## DISCUSSION

¶ 19 The issues before this court are whether the trial court erred by (1) granting summary judgment in favor of Snyder on the malicious prosecution claim simply because summary judgment and a Rule 50 motion were denied in the underlying action, and (2) dismissing Chalpin and Hi–Health's aiding and abetting claim against Snyder based on a general policy of limiting actions against adverse attorneys to malicious prosecution and abuse of process.

## I. MALICIOUS PROSECUTION

¶ 20 The civil tort of malicious pros-

---

**3.** Chalpin and Hi–Health do not appeal the trial court's entry of summary judgment on the abuse of process claim.

**4.** Snyder argues that many of the facts regarding Reliance's investigation are based on notes, documents and testimony from the underlying bad

faith/coverage action that are inadmissible hearsay. The trial court did not address this issue, nor did it strike any of the documents. Given that the trial court has not ruled on the admissibility of these documents, we will not address the issue on appeal.

ecution[5] includes five elements: "that the defendant '(1) instituted a civil action which was (2) motivated by malice, (3) begun [or maintained] without probable cause, (4) terminated in plaintiff's favor and (5) damaged plaintiff.' " *Wolfinger,* 206 Ariz. at 508–09, ¶ 23, 80 P.3d at 787–88 (quoting *Bradshaw v. State Farm Mut. Auto. Ins. Co.,* 157 Ariz. 411, 416–17, 758 P.2d 1313, 1318–19 (1988)). Here and in the trial court the parties have focused exclusively on the probable cause element.

> Whether a given set of facts constitutes probable cause is always a question of law to be determined by the court. The only function of the jury is to determine what the actual facts are if the facts are conflicting. *If from one set of facts the conclusion can be inferred that probable cause exists, and from another that it does not, it is for the jury to determine the true state of facts.*

*Id.* at 509, ¶ 25, 80 P.3d at 788 (emphasis in original) (quoting *Carroll v. Kalar,* 112 Ariz. 595, 598–99, 545 P.2d 411, 414–15 (1976)).

■ ¶ 21 Probable cause does not exist "merely because at the time an action is filed there is some evidence that will withstand a motion for summary judgment." *Bradshaw,* 157 Ariz. at 417, 758 P.2d at 1319. As our supreme court has explained:

> The law has never recognized this as the test for malicious prosecution. The proper test is subjective *and* objective. The initiator of the action must honestly *believe* in its possible merits; and, in light of the facts, that *belief must be objectively reasonable.*

*Id.* (emphasis in original, footnote and citations omitted); *see also Wolfinger,* 206 Ariz. at 510–12, ¶¶ 30–37, 80 P.3d at 789–91. In *Wolfinger,* we held that courts must first determine the issue of objective probable cause before examining the subjective beliefs. *Id.* at 509–10, ¶¶ 26–27, 80 P.3d at 788–89. In effect, a party's subjective belief in the merits of a claim only becomes an issue if there is no objective probable cause.

¶ 22 Therefore, the issue is whether Snyder had objective probable cause to initiate the claims against Chalpin and Hi–Health. Snyder argues initially that this is a simple matter in light of the rulings made in the underlying litigation denying summary judgment to Hi–Health and denial of judgment as a matter of law under Rule 50. Our review of the record reveals that the trial court in the underlying litigation found the facts to be complicated and disputed. This is not surprising considering the intensity of the litigation and the fact that many of the witnesses were employees of one of the parties. When faced with such situations, trial courts may avoid premature dispositive rulings for either side by allowing a jury to hear the case.

■ ¶ 23 We have previously held that denying a motion for summary judgment and allowing a claim to go to the jury is not conclusive evidence that a party initiating a claim had probable cause to bring it for purposes of a malicious prosecution action. *Wolfinger* 206 Ariz. at 510–12, ¶¶ 30–37, 80 P.3d at 789–91. Such rulings may be considered in determining probable cause, but they are not conclusive. *Id.* We conclude that this rule equally applies to denials of motions for judgment as a matter of law under Rule 50. It is undisputed that when considering a Rule 50 motion a "trial judge is not required to grant judgment as a matter of law even in a case in which it has the power to do so." 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2533, at 318 (2d ed.1994). Therefore, the trial court erred in finding that, for purposes of finding probable cause, Rule 50 motions are distinct from Rule 56 summary judgment motions. This does not, however, end our analysis. We must also consider whether the record of the underlying litigation supports the trial court's ruling that probable cause existed.

■ ¶ 24 "Whether the facts in a particular case are sufficient to constitute probable cause is a question of law to be determined by a reasonable man test. '[U]pon the ap-

**5.** We recognize that civil malicious prosecution is more properly referred to as "wrongful institution of civil proceedings." *Giles v. Hill Lewis Marce,* 195 Ariz. 358, 360 n. 1, ¶ 5, 988 P.2d 143, 145 n. 1 (App.1999). Because the parties and trial court consistently used the term malicious prosecution, we will follow suit.

pearances presented to the defendant, would a reasonably prudent man have instituted or continued the proceeding?'" *Carroll*, 112 Ariz. at 596, 545 P.2d at 412 (quoting *McClinton v. Rice*, 76 Ariz. 358, 367, 265 P.2d 425, 431 (1953)). As we have previously recognized, however, it is sometimes less than certain how courts should measure this standard. *Smith v. Lucia*, 173 Ariz. 290, 297, 842 P.2d 1303, 1310 (App.1992). The parties argue for slightly different measures.

¶ 25 Chalpin and Hi–Health argue that our supreme court defined probable cause in *Bradshaw* when it stated that in "civil cases ... the test is whether the initiator 'reasonably believes that he has a good chance of establishing [his case] to the satisfaction of the court or the jury.' PROSSER & KEETON § 120, at 893." 157 Ariz. at 417, 758 P.2d at 1319. Snyder argues in response that the supreme court's "good chance" standard no longer applies in light of our decisions in *Smith* and *Wolfinger*, which held that probable cause is lacking only if "there was no chance of success under existing precedent." Snyder also argues that the "good chance" standard in *Bradshaw* was intended to apply only to the subjective component of probable cause.

¶ 26 We reject Snyder's latter argument. In *Bradshaw*, the supreme court referred to whether an initiator "reasonably believes" the chances of establishing the case. 157 Ariz. at 417, 758 P.2d at 1319. This reasonable belief plainly refers to objective probable cause. In contrast, in a later paragraph the court discussed requiring that a party "honestly believes it may establish its case." *Id.* at 418, 758 P.2d at 1320. Similarly, this plainly refers to subjective probable cause and is distinct from a party's "reasonable belief." Therefore, we conclude that *Bradshaw's* objective probable cause test includes the "good chance" standard.

¶ 27 How then did our case law evolve from *Bradshaw's* requirement that a claimant have a "good chance" of establishing a claim to our more recent description that a claimant must have "no chance" of success? The change occurred in *Smith. Smith* correctly quoted the "good chance" language from *Bradshaw* in its general description of probable cause. *Smith*, 173 Ariz. at 294, 842 P.2d at 1307. The language was not referred to, however, later in the opinion in the more specific language addressing objective probable cause. Without analysis, the court simply defined objective reasonableness as being equivalent to compliance with Rule 11 of the Arizona Rules of Civil Procedure.

> Cases decided under Rule 11, Federal Rules of Civil Procedure, which is identical to Rule 11, Arizona Rules of Civil Procedure, are helpful in determining the standard by which we may measure the reasonableness of an attorney's conduct. Under Rule 11, an attorney violates the objective standard when: (1) there was no reasonable inquiry into the basis for a pleading or motion; (2) there was no chance for success under existing precedent; and (3) there was no reasonable argument to extend, modify, or reverse the controlling law. We conclude that the Rule 11 objective standard should apply here.

> The Rule 11 objective standard is consistent with *Bradshaw* in that, even if the existence of the alleged facts is not certain, it is enough if the attorney reasonably believes he can establish their existence to "the satisfaction of the jury."

173 Ariz. at 297, 842 P.2d at 1310 (footnote and citations omitted). Having laid out this standard, *Smith* actually applied a slightly different one. The opinion later states that the "question is not whether the underlying suit would have been successful, but whether Lucia had a reasonable chance of success on the merits." 173 Ariz. at 299, 842 P.2d at 1312.

¶ 28 Following *Smith*, we applied the "no chance of success" standard in *Wolfinger*. Although citing *Bradshaw*, our opinion did not discuss the different language used in the two opinions and apparently the issue was not raised. Quoting *Smith*, we simply summarized that "to survive objective reasonableness ... the hurdle one must clear (though real) is not great. There must be 'no chance of success under existing precedent.'" *Wolfinger*, 206 Ariz. at 516, ¶ 53, 80 P.3d at 795.

¶ 29 We agree with *Smith* that the first and third prongs of the Rule 11 standard are consistent with *Bradshaw*: the necessity of a reasonable inquiry and the ability to argue for a change to existing law. The difference between "good chance" and "no chance" is harder to reconcile. In attempting to do so, we first note that each of the two phrases must be interpreted in light of the overriding purpose of the objective probable cause standard—to ensure that the "person filing a civil suit ... reasonably believes in the possibility that the claim may be valid." *Smith*, 173 Ariz. at 294, 842 P.2d at 1307.

¶ 30 With this qualification, the gap between "good chance" and "no chance" may be minimal. An initiator of a claim may fail to establish a "good chance" of success because there is "no chance" of success. It may be, however, that an initiator has more than "no" chance, perhaps "some" chance, but no reasonable belief that there is a "good" chance. We recognize that this difference is subtle. Nevertheless, as the parties argue, it does exist. Moreover, the trial court in this case quoted the "no chance of success" language in its ruling, and emphasized its application of the "low standard prescribed in *Wolfinger*." Therefore, we must address whether *Bradshaw's* "good chance" test remains the law.

¶ 31 Although we understand that *Smith* was attempting to better explain and refine the standard for objective probable cause when it adopted Rule 11 standards, we agree with Chalpin and Hi-Health that the "good chance" language from *Bradshaw* is the controlling test. Our supreme court has not altered it. Until it does so we are bound by its holding. *State v. Smyers*, 207 Ariz. 314, 318 n. 4, ¶ 15, 86 P.3d 370, 374 n. 4 (2004) ("The courts of this state are bound by the decisions of this court and do not have the authority to modify or disregard this court's rulings.").

¶ 32 We are also persuaded that the supreme court did not lightly adopt the requirement that an initiator "reasonably believes that he has a good chance of establishing [his case] to the satisfaction of the court or the jury." The supreme court took this language directly from the Prosser and Keeton text on torts, which described it as the standard in a civil malicious prosecution action. Moreover, *Bradshaw* cited with approval the Restatement (Second) of Torts § 675 (1977), which defines probable cause to exist when an initiator "reasonably believes that [under facts he reasonably believes to exist] the claim may be valid under the applicable law." The comments to that section of the Restatement refer to an initiator having a "sound" chance of success. Comment e ("In determining probable cause for initiation of civil proceedings, all that is necessary is that the claimant reasonably believe that there is a sound chance that his claim may be held legally valid upon adjudication."); comment f ("The question is not whether he is correct in believing that the court would sustain the claim, but whether his opinion that there was a sound chance that the claim might be sustained was a reasonable one."). We believe a "sound" chance is more than "no chance" and is essentially equivalent to the term used by the supreme court—"good chance." Therefore, we conclude that the correct standard to be used to measure an initiator's reasonable chance of success is the "good chance" test contained in *Bradshaw*.[6]

¶ 33 Applying this test, Chalpin and Hi-Health argue that, viewing the facts in the light most favorable to the party opposing summary judgment, the trial court erred in granting summary judgment on their malicious prosecution claim. They argue that Snyder knew the doctrine of reasonable expectations would preclude Reliance from disavowing coverage and initiated the claims to exert improper pressure without conducting a reasonable investigation. In essence, they argue that after Reliance became aware of the enormity of its exposure for Debra's accident, it improperly attempted to revisit its original decision to provide coverage to De-

---

6. In determining probable cause for contesting a will, the supreme court has adopted the test that there be a "substantial likelihood of success." *In re Estate of Shumway*, 198 Ariz. 323, 327–28, ¶¶ 12–13, 9 P.3d 1062, 1066–67 (2000) (quoting Restatement (Second) of Property: Donative Transfers § 9.1 cmt. j (1983)).

bra. When it realized it was too late to do so, it enlisted Snyder to spearhead efforts to shift its loss to its own insureds. Our review of the record leads us to conclude that this is a reasonable interpretation of the facts.

¶ 34 Hi–Health was a significant customer of Reliance. When Hi–Health sought to add Debra, the daughter of its owner, to its general liability policy Reliance could have done several things. It could have declined, or offered to issue Debra an individual policy with lower liability limits. Perhaps most importantly, it could have asked more questions and sought more information. It did none of these things. Instead, it extended coverage and accepted a premium.

¶ 35 After Debra's accident, Reliance's initial response was to provide coverage. The record shows Reliance quickly became aware of the problems with the quality of its original underwriting, but Reliance officials recognized that these would likely be insufficient to deny coverage due to the reasonable expectations doctrine. Only after it became apparent that its liability would exceed five million dollars did Reliance go into "damage control" mode. Although it eventually paid the claim to the injured third party, it also threatened Hi–Health and Debra with denial of coverage or a lawsuit to seek reimbursement. In the face of this threat, Hi–Health and Debra filed an action against Reliance seeking a judicial determination that they were not liable to Reliance for the monies it had paid under the policy.

¶ 36 If Reliance had simply defended that lawsuit the current dispute would probably not be before this court. What Reliance did, however, was to raise the stakes by having Snyder sue Hi–Health and Debra, as well as Chalpin himself, in a separate action in a California federal court. When the federal action was dismissed for improper venue, Snyder filed the same claims as a cross-claim in the original action in Arizona. This cross-claim was filed in July 1998, a year after Hi–Health filed its original action and almost two years after Debra's accident.

¶ 37 Snyder argues in his brief that he was justified in filing the cross-claim, as shown by the fact that the claims had to be resolved at trial rather than through summary judgment.

There were disputed questions· of fact about Reliance's claims. That does not, as plaintiffs suggest, indicate that there are disputed questions of fact on this malicious prosecution claim. In fact, it means the opposite. That Reliance's claims against the Chalpins and Hi–Health presented fact questions for the jury—a point vividly demonstrated by the rulings of not one but two judges—establishes as a matter of law that the claims were, in the language of malicious prosecution law, "objectively reasonable."

These disputes of fact forced the case to trial. As the trial court in the underlying litigation explained:

The Court considered carefully whether Reliance's fraudulent misrepresentation claim could withstand a summary judgment request. The claim survives because the Court discovered, in considering this issue, that it would be required to weigh the credibility of evidence submitted by the parties to render a decision. This establishes that a trial is required, as does the fact that the Court is not yet confident that it understands the circumstances under which Reliance insures individuals such as Debra Chalpin. It is clear that Willis Corroon and Plaintiff are certain the answer is "always." Reliance appears to be just as adamant that the answer is "never." Absent settlement, a jury will decide this and other relevant questions.

In effect, the trial court recognized that the case had to go to trial because Reliance adamantly asserted that it had been defrauded and it would have acted differently if Hi–Health had given it different information. Whether this assertion was true was a question uniquely within the control of Reliance and Snyder, who the record indicates was acting not just as Reliance's attorney, but as a part of its decision-making team. By submitting the dispute to a jury, the trial court properly recognized that the question came down to weighing the evidence.

¶ 38 The question before us, however, is different. The test for objective probable cause is not whether a person can force

an issue to trial. The question is whether in doing so "the initiator 'reasonably believes that he has a good chance of establishing [his case] to the satisfaction of the court or the jury.'" *Bradshaw*, 157 Ariz. at 417, 758 P.2d at 1319 (quoting Prosser & Keeton § 120, at 93). In other words, "would a reasonably prudent [lawyer] have instituted or continued the proceeding?" *Carroll*, 112 Ariz. at 596, 545 P.2d at 412 (quoting *McClinton*, 76 Ariz. at 367, 265 P.2d at 431).

▇▇ ¶ 39 Chalpin and Hi–Health argue it was not reasonable for Snyder to file the cross-claims because before he initiated the claims both he and Reliance knew the true state of all of the facts they would later argue allowed Reliance to disavow coverage. Indeed, Chalpin and Hi–Health argue these facts were well-known shortly after the accident, yet Reliance continued to provide coverage for Debra and her replacement vehicle after the accident until she received a speeding ticket several months later. They also argue that any reasonable attorney would have recognized that these facts did not create a good chance that Reliance could make Chalpin and Hi–Health liable for the monies Reliance had paid under its policy.

▇▇ ¶ 40 We agree with Chalpin and Hi–Health. Based on our examination of the record, we conclude that a reasonable jury could conclude that before filing suit Snyder knew or had reason to believe all of the facts that would lead a reasonable attorney to conclude that coverage existed under the doctrine of reasonable expectations. Under these circumstances, a jury could conclude that Snyder could not reasonably believe that there was a "good chance of establishing

[their case] to the satisfaction of the court or the jury." *Bradshaw*, 157 Ariz. at 417, 758 P.2d at 1319. Therefore, the trial court erred by granting summary judgment to Snyder on the malicious prosecution claim.[7]

## II. AIDING AND ABETTING

¶ 41 The trial court dismissed the aiding and abetting claims because it read Arizona law as limiting actions against lawyers to abuse of process and malicious prosecution. It specifically cited *Linder v. Brown and Herrick*, 189 Ariz. 398, 943 P.2d 758 (App. 1997), as rejecting a primary claim of fraud by an adverse party and concludes that this shows that actions against lawyers for other causes of action cannot be filed.

¶ 42 Chalpin and Hi–Health argue that the trial court erred because (1) it ignored the general rule of the Restatement (Third) of the Law Governing Lawyers § 56 (2000), pursuant to which "lawyers have no special privileges against civil suit," (2) the court failed to recognize that cases from other jurisdictions hold that attorneys may be held liable for aiding and abetting their client's tortious conduct, and (3) the complaint adequately alleged a claim for aiding and abetting seven torts. Snyder responds that the trial court correctly dismissed the aiding and abetting count because (1) aiding and abetting is not itself a tort and it has been recognized only sparingly in Arizona, (2) this court has limited the circumstances in which claims may be brought against opposing counsel to malicious prosecution and abuse of process, citing *Linder*, 189 Ariz. 398, 943 P.2d 758, *Lewis v. Swenson*, 126 Ariz. 561, 617 P.2d 69 (App.1980), and *Giles*, 195 Ariz. 358, 988 P.2d 143, (3) limiting actions against

---

7. Chalpin also argues that summary judgment against him must be reversed because Snyder had no probable cause to initiate personal claims against him. In the trial court, Snyder attempted to justify bringing personal claims against Chalpin based on his direct involvement in procuring insurance for Debra and the assertion that he would be personally responsible for Hi–Health's liability. As noted above, however, the issue of Hi–Health being Chalpin's alter-ego for liability purposes was not even presented to the jury through an instruction. Moreover, the record fails to show any direct involvement by Chalpin in obtaining coverage for Debra from Reliance.

Although Chalpin's opening brief specifically raised this issue, Snyder's brief does not address whether he had probable cause for bringing personal claims against Chalpin. Failure to respond in an answering brief to a debatable issue constitutes confession of error. *Hecla Min. Co. v. Indus. Comm'n*, 119 Ariz. 313, 314, 580 P.2d 774, 775 (App.1978). For this reason alone, we could reverse the trial court's summary judgment against Chalpin. In any event, our review of the record reveals no probable cause to initiate the personal claims against Chalpin. Therefore, the trial court erred by entering summary judgment against Chalpin personally on the malicious prosecution claim.

attorneys is of constitutional dimension, (4) under settled Arizona law, the aiding and abetting claims fail, (5) reliance on the Restatement is misplaced, and (6) aiding and abetting were not properly pleaded in the complaint.

¶ 43 First, we disagree with the trial court's conclusion that Arizona law limits actions against lawyers to only two causes of action—abuse of process and malicious prosecution. The absence of published cases specifically recognizing other actions does not mean they do not exist.

¶ 44 The Arizona Supreme Court has adopted the general rule set forth in the Restatement (Third) of the Law Governing Lawyers that "lawyers have no special privilege against civil suit." See Safeway Ins. Co. v. Guerrero, 210 Ariz. 5, 10, ¶ 15, 106 P.3d 1020, 1025 (2005); see also McElhanon v. Hing, 151 Ariz. 386, 394, 728 P.2d 256, 264 (App.1985) (rejecting argument that attorney's acts were "privileged, unless he has engaged in malicious prosecution or abuse of process"), aff'd in part and vacated in part on other grounds, 151 Ariz. 403, 728 P.2d 273 (1986); Fickett v. Superior Court, 27 Ariz. App. 793, 795, 558 P.2d 988, 990 (1976) (attorney may be held liable to an adverse party for lawyer's acts of fraud or collusion). As we explained in Giles, the "policy" mentioned in some earlier cases, such as Linder and Lewis, concerning attorney immunity from liability "was premised upon the absolute privilege from defamation afforded participants in judicial proceedings," rather than any broader public policy. 195 Ariz. at 361, 988 P.2d at 146.

¶ 45 Under the general rule, "a lawyer is subject to liability to a client or non-client when a nonlawyer would be in similar circumstances." Restatement (Lawyers) § 56. Moreover, "[w]hen a lawyer advises or assists a client in acts that subject the client to civil liability to others, those others may seek to hold the lawyer liable along with or instead of the client." Id. at cmt. c. Our cases have recognized aiding and abetting as a valid claim in a civil lawsuit. See Wells

Fargo Bank, 201 Ariz. at 485, ¶ 31, 38 P.3d at 23 ("Arizona [law] recognizes aiding and abetting as embodied in Restatement [ [ (Second) of Torts] § 876(b), that a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person."); Security Title Agency, Inc. v. Pope, 219 Ariz. 480, ¶ 44, 200 P.3d 977, ¶ 44 (App. 2008) (recognizing aiding and abetting claim for breach of fiduciary duty); Dawson v. Withycombe, 216 Ariz. 84, 102–03, ¶¶ 49–52, 163 P.3d 1034, 1052–53 (App.2007) (discussing aiding and abetting fraud). In light of these authorities, we reject the trial court's conclusion that aiding and abetting is not a valid cause of action against lawyers.

¶ 46 We also reject Snyder's argument that the constitution limits aiding and abetting claims. Snyder argues that under the First Amendment's Noerr–Pennington[8] doctrine any lawsuit based on the filing of a complaint in court is subject to constitutional protections such as objective probable cause. We find that this issue is not properly before us. Our holding that aiding and abetting certain tort claims may be brought against Snyder does not address what elements need to be proven for each of the alleged underlying torts. The trial court never reached any issue involving the underlying torts, except for abuse of process and malicious prosecution. Any argument Snyder has that there are constitutional limits to the specific claims alleged by Chalpin and Hi–Health should be addressed to the trial court on remand. We will not address them here.

¶ 47 We also reject Snyder's argument that the aiding and abetting claims were not properly pleaded. Snyder recognizes that the trial court did not expressly rule in his favor for this reason, but argues that the complaint did not adequately put him on notice of the claims against them. Given that the trial court did not dismiss the aiding and abetting claims on this ground, we will not affirm the dismissal for that reason. Moreover, if such a pleading defect exists, the trial court should first give Chalpin and

8. Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers v. Pen-

nington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

Hi–Health the opportunity to amend the complaint to provide additional detail. *See Acker v. CSO Chevira*, 188 Ariz. 252, 255, 934 P.2d 816, 819 (App.1997) ("Before a Rule 12(b)(6) motion to dismiss is granted, the nonmoving party should be given an opportunity to amend the complaint if such an amendment will cure its defects.").

## CONCLUSION

¶ 48 We reverse the trial court's orders dismissing the aiding and abetting claims and granting summary judgment on the malicious prosecution claims. We remand for further proceedings consistent with this opinion.

CONCURRING: JON W. THOMPSON, Presiding Judge and LAWRENCE F. WINTHROP, Judge.